**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Peter John WEBER,**
**Defendant–Appellant.**

No. 89–10096.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 17, 1990.

Decided Sept. 28, 1990.

Paul B. Meltzer, Peter A. Leeming, Santa Cruz, Cal., for defendant-appellant.

Rory Litte, Asst. U.S. Atty., San Francisco, Cal., for plaintiff-appellee.

Before LIVELY,* FLETCHER, and REINHARDT, Circuit Judges.

FLETCHER, Circuit Judge:

Peter John Weber appeals his conviction based on a conditional guilty plea in which Weber reserved the right to appeal the district court's denial of his motion to suppress evidence. Weber argues that the warrant issued to search his house lacked particularity and was not based on probable cause. We reverse the district court.

## I.

## FACTS

On June 11, 1987 United States Customs Service Special Agent Trevor Burke presented a sworn affidavit to the district court requesting that a warrant be issued to search the house of defendant Weber.

At the time Agent Burke requested the warrant, he knew the following information about Weber: On August 12, 1985, almost two years prior to the date of the warrant, an unknown customs inspector seized a parcel addressed to "P. Webber" at the same address where the defendant resided on the day the warrant was requested. The parcel contained two pieces of advertising material, which the customs inspector concluded "*apparently* depict[ed] the sexual exploitation of children." Customs notified Weber of the seizure of the parcel via certified mail. Weber acknowledged receipt of the notice but did not attempt to claim the material.[1] Customs made no determination as to whether Weber had ordered the advertising material or whether the advertisements had been sent unsolicited.

On the basis of this "apparently" pornographic set of advertising materials, Customs targeted Weber for investigation. Approximately 20 months later, on March 9, 1987, Customs sent Weber an undercover test advertisement containing the name and address of a purported distributor of sexually explicit materials in Canada. The purported distributor was, in fact, a fictitious creation of the United States and Canada Customs Services set up as part of a reverse "sting" operation. The advertisement contained a list of photographs for sale, including, among others, "Piccolo" and "Chicken." The ad said the pictures featured "boys and girls in sex action."

On April 6, 1987, Weber, having seen only the advertisement, and not the pictures themselves, placed an order for four sets of pictures (*Piccolo # 16, Piccolo # 31, Piccolo # 37,* and *Chicken # 11* ). The pictures the government intended to send depicted minors displaying their genitals or engaging in various sexual acts such as fondling, masturbation, and oral and anal sex. The pictures were to be delivered to Weber's house on June 12, 1987 by Agent Burke, who would be wearing the uniform of a delivery man employed by DHL Courier.

Based on these facts—and a general description of the proclivities of pedophiles, which description we discuss momentarily—Burke stated he believed that on June 12, agents would find at Weber's house not only the four sets of photographs which would arrive as a result of the "controlled delivery" and which were described in the warrant's first paragraph,[2] but also the following items, set forth in paragraphs two, three, and four:

---

* The Honorable Pierce Lively, Senior Circuit Judge of the Sixth Circuit, sitting by designation.

1. When a customs agent discovers an item that he or she believes is contraband, the agent seizes the item and Customs then gives the addressee an opportunity to demonstrate its legality. 19 U.S.C. § 1305.

2. The first paragraph stated:

1. Four sets of photographs, each set containing twelve (12) $3\frac{1}{2} \times 5$ inch photographs. Said photographs are reproductions from Piccolo # 16, 31, 37; and Chicken # 11. The photographs were imported in a DHL common carrier parcel addressed to P. Webber. The magazines contain visual depictions of minors engaged in sexually explicit conduct as proscribed by 18 U.S.C. 2251 through 2256.

2.  Books, magazines, pamphlets, photographs, negatives, films, video tapes and undeveloped films depicting minors under the age of 18 years engaged in sexually explicit conduct as defined in 18 U.S.C. 2256; video cameras and recorders, still cameras, movie projectors and screens, enlargers, and developing equipment and photographic paper, all used for the taking, producing, and reproducing of visual depictions of minors engaged in sexually explicit conduct;

3.  Phone books and address books, diaries, correspondence or papers containing names, addresses and telephone numbers which would tend to identify other persons who deal in material depicting minors engaged in sexually explicit conduct or identify minors who may be victims;

4.  Correspondence, order blanks, and records of any kind reflecting the ordering, receipt, shipping and payment for materials depicting minors engaged in sexually explicit conduct.

For purposes of this search warrant, the attached definitions apply (18 U.S.C. 2256).

To attempt to establish probable cause that the items in paragraph 2 would be found in Weber's house, Burke set forth in his affidavit a general description of the proclivities of pedophiles. The description was based on Burke's experience and training in child pornography investigations and his discussions with other law enforcement agents—in particular Los Angeles Police Detective Dworin, who had more training and experience than Burke.

The description consumes several pages of the affidavit. It reports Dworin's conclusions based on Dworin's knowledge of three different kinds of suspects, "child molesters," "pedophiles," and "child pornography collectors." These terms are not defined. For example, nowhere in the affidavit does it say how many purchases of child pornography it takes for a person to be deemed a "collector" or "pedophile." Agent Burke does not state that Dworin is familiar with Weber's case, nor does Burke himself opine that Weber probably is a "child molester," "pedophile," or "collector

of pornography" based on what he knows of Weber.

The affidavit recites Dworin's belief that a pedophile "typically" uses sexually explicit materials to show to children to lower their inhibitions so that the pedophile may molest them. Dworin says that pedophiles "often" take photographs of their victims and develop the pictures with their own developing equipment. He says further that they "may" use sexual aids sold in adult bookstores to stimulate their victim or themselves.

The affidavit also contains Dworin's opinion that "pedophiles and/or child pornography collectors" do not destroy photographs but retain them for "many years." Agent Burke says in the affidavit that such materials are sometimes "concealed in safety deposit boxes, private commercial storage spaces, beneath homes, buried, in automobiles, hidden inside of legitimate books, at work places, etc." Burke also says that "Dworin is ... aware that such material is kept in the pedophile's and/or child pornography collector's residence or other secure convenient locations to ensure ready availability."

It is important to note that nowhere in Burke's affidavit is there even a conclusory recital that the evidence of Weber's demonstrated interest in child pornography—consisting of one proven order—places him in the category of those pedophiles, molesters, and collectors about whom Dworin has expertise.

The warrant was signed by the district judge on June 11 and executed on June 12, shortly after Burke, dressed as a DHL employee, delivered the four picture sets. Government agents quickly found the unopened package containing the pictures on Weber's kitchen counter. Pursuant to the warrant, they continued to search the rest of Weber's house, finding two plastic bags between the mattress and box springs of his bed. The agents opened the bags, which contained 16 magazines in addition to advertising brochures from overseas child pornography suppliers.

## II.

### PROCEDURAL HISTORY

Weber's indictment charged two counts of violating 18 U.S.C. § 2252(a)(2)(B), which prohibits the receiving of visual depictions of minors engaged in sexually explicit conduct. Count I charged him with receiving the materials sent to him by Customs (and specified in the first paragraph in the warrant). Count II charged him with receiving the other materials, which were seized on the authority of the contested second paragraph of the warrant. The government conceded to the trial court that the third paragraph of the warrant was invalid, but no materials were seized pursuant to that paragraph.

Weber made a motion in the district court to suppress the materials seized pursuant to the second paragraph. He argued that the warrant was not based on probable cause and that it lacked particularity. The district court judge, the same judge who had initially signed the warrant, denied the motion. Weber also argued that the government entrapped him as a matter of law and that the indictment should be dismissed on the ground that the investigation of him constituted "outrageous conduct" in violation of the Fifth Amendment. The court ruled that the entrapment defense should go to the jury, but rejected the outrageous conduct defense.

Before trial, Weber and the prosecution entered into a plea agreement. Weber conditionally pled guilty to Count II and Count I was dropped. Count II was based on the materials seized pursuant to the controversial second paragraph of the warrant.[3] As a condition to his plea, Weber reserved the right to appeal the suppression motion. He does not appeal the outrageous conduct ruling.

## III.

### DISCUSSION

The Warrant Clause of the Fourth Amendment provides:

No Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

The Supreme Court has stated time and again that this clause prohibits the "general warrant." *Boyd v. United States,* 116 U.S. 616, 625, 6 S.Ct. 524, 529, 29 L.Ed. 746 (1886); *Andresen v. Maryland,* 427 U.S. 463, 478, 96 S.Ct. 2737, 2747, 49 L.Ed.2d 627 (1976). And we have held, "The requirement that a warrant not be a general one is in part a function of the probable cause rule and is in part derived from the fourth amendment requirement that warrants be ones 'particularly describing the place to be searched, and the persons or things to be seized.' " *United States v. Hillyard,* 677 F.2d 1336, 1339 (9th Cir. 1982).

To satisfy the demands of the Warrant Clause, a warrant must comply with two related but distinct rules. First, it must describe the place to be searched or things to be seized with sufficient particularity, taking account of "the circumstances of the case and the types of items involved." *United States v. Spilotro,* 800 F.2d 959, 963 (9th Cir.1986). Second, it must be no broader than the probable cause on which it is based. *VonderAhe v. Howland,* 508 F.2d 364 (9th Cir.1974). The particularity rule and the probable cause rule serve a common purpose: to protect privacy by prohibiting "a general, exploratory rummaging in a persons belongings." *Id.* at 369 (citations and internal quotations omitted). Although the two rules serve the same ultimate purpose, they achieve the purpose in distinct ways.

The particularity rule requires the magistrate to make sure that the warrant describes things with reasonable precision, since vague language can cause the officer performing the search to seize objects "on the mistaken assumption that they fall within the magistrate's authorization." 2 LaFave, Search and Seizure, § 4.6(a). The probable cause rule prevents the magistrate from making a mistaken authoriza-

---

**3.** Weber has never argued that paragraph 1 was deficient.

tion to search for particular objects in the first instance, no matter how well the objects are described. *Id.* The two separate rules must both be met since an unnecessary invasion of privacy can occur either when the magistrate has a firm command of the doctrine of probable cause and a poor command of the English language, or vice versa.

We apply each rule to the facts of this case.

### A. *The Particularity Requirement*

■ In *United States v. Rabe*, 848 F.2d 994, 997–98 (9th Cir.1988), we held that a warrant describing the materials to be searched by reference to what is now section 2256 of title 18 of the United States Code (and what was then section 2255) met the particularity requirement.[4] We relied on *United States v. Hurt*, 808 F.2d 707, 708 (9th Cir.1987), *amending United States v. Hurt*, 795 F.2d 765 (9th Cir.1986), in which we distinguished warrants authorizing searches for materials depicting minors involved in sexually explicit conduct from those authorizing searches for materials described as "obscene," *see United States v. Hale*, 784 F.2d 1465 (9th Cir. 1986), on the ground that the latter standard was too vague. The portion of the warrant challenged in this case is the same as that challenged in *Rabe;* it therefore meets the particularity requirement.

### B. *The Probable Cause Requirement*

■ Although the portion of the warrant on appeal passes the particularity test, it is nonetheless invalid, because it seeks items as to which there is no probable cause. Weber does not deny that probable cause existed for the four picture sets that arrived at his house as a result of the Customs' "controlled delivery."[5] It is the other materials, described in paragraph 2, that are at issue.

*Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), sets the standard of review of a magistrate's probable cause determination. We must ensure that the magistrate had a "substantial basis" for finding probable cause. *Id.* at 238, 103 S.Ct. at 2332; *United States v. Seybold*, 726 F.2d 502, 503 (9th Cir.1984). The affidavit of agent Burke did not provide a substantial basis to find probable cause in this case.

■ Our decision in *VonderAhe* sets forth the principles that guide us here.[6] In *VonderAhe*, an agent of the Internal Revenue Service had conducted an audit of the plaintiff dentist's records and found that they accurately reflected the income reported. But shortly after the audit was completed, employees of the plaintiff informed the IRS agent that the dentist kept two sets of patient records, a legitimate set on white cards and a secret set on green and yellow cards. Armed with this information the agent sought and was granted a warrant authorizing the seizure of all of the doctor's records "including, but not limited to dental patient cards." The district court held that there was probable cause to believe the plaintiffs were violating the tax laws and upheld the warrant in its full

---

**4.** 18 U.S.C. § 2256 provides in relevant part: For the purposes of this chapter, the term—
    (1) "minor" means any person under the age of eighteen years.
    (2) "sexually explicit conduct" means actual or simulated—
    (A) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;
    (B) Bestiality;
    (C) Masturbation
    (D) sadistic or masochistic; abuse; or
    (E) lascivious exhibition of the genitals or pubic area of any person[.]

**5.** In *Hale*, 784 F.2d at 1468–69, we held that an "anticipatory warrant" authorizing the search

for materials that would arrive as a result of a "controlled delivery" by the government was permissible. *Cf. United States v. Hendricks*, 743 F.2d 653 (9th Cir.1984).

**6.** Weber relies on *United States v. Hale*, 784 F.2d at 1469, for the proposition that a stricter probable cause standard should apply when first amendment values are implicated. The subsequent Supreme Court decision in *New York v. P.J. Video, Inc.*, 475 U.S. 868, 875, 106 S.Ct. 1610, 1615, 89 L.Ed.2d 871 (1986) rejected this proposition. To the extent *Hale* stands for the proposition for which Weber cites it, it is no longer good law.

breadth. We reversed. We agreed that the government had shown probable cause to search for and seize the green and yellow cards, but that in light of the government's knowledge that the other records were not likely to contain incriminating information, there was no probable cause shown to justify a broader search. *VonderAhe*, 508 F.2d at 370.

*VonderAhe* is different from our case in that the government in that case knew too much when it asked for the broad warrant, while in this case the government knew too little. But the important principle of *VonderAhe* is that probable cause to believe that *some* incriminating evidence will be present at a particular place does not necessarily mean there is probable cause to believe that there will be more of the same. *See* 2 LaFave § 3.7(d) ("For example, if it is shown that the occupant of the premises to be searched recently knowingly received two items of stolen property, ... there is probable cause to search for those two items, but this alone does not establish the suspect's ongoing activities as a fence so as to justify issuance of a warrant authorizing search for other stolen property as well.") (citing *State v. Sagner*, 12 Or.App. 459, 506 P.2d 510 (1973)). In *Hillyard*, we upheld a warrant, rejecting the defendant's argument that although there was probable cause for some specified items, there was insufficient cause to search for more items of the same type. But we did not mechanically reason that "some implies more"; rather, we carefully considered whether the pre-warrant investigation, as described in the affidavit presented to the magistrate, established probable cause that items of the nature specified would be present. *Hillyard*, 677 F.2d at 1339–40; *see also In re Grand Jury Proceedings*, 716 F.2d 493, 498–99 (8th Cir.1983).

With these principles in mind, we review the information possessed by agent Burke when he swore out his affidavit. He knew (1) that two years previously, Weber had been sent advertising material that was described by the customs agent who intercepted it as "apparently" child pornogra-

phy; (2) that although Weber was advised that Customs had the material, he never claimed it; (3) that there was no proof that Weber requested the advertising material; and (4) that Weber answered a government-generated advertisement for child pornography and ordered materials that were to be delivered by the government just before the execution of the warrant.

On these facts, to find probable cause for the materials listed in paragraph 2 of the warrant would be to justify virtually any search of the home of a person who has once placed an order for child pornography—even if he never receives the materials ordered. There would be no need for the government to plan elaborate schemes for undercover controlled deliveries and no need for the government actually to distribute child pornography to achieve its law enforcement goals. All the government would have to do is send out phony advertisements for child pornography, wait for responses, and immediately execute warrants to search the houses of those responding affirmatively. Perhaps the government does not operate that way because, absent the certainty of retrieving the materials sent by controlled delivery, there would be too high a risk that the searches would be wholly unsuccessful. But searches with a substantial risk of failure are exactly those for which there is no probable cause in the first place.

In addition to the one order solicited by the government, the only other piece of evidence arguably suggesting that Weber may have had child pornography in his house on the day of the search was the fact that a customs agent, almost two years previously, had identified advertising material addressed to Weber as "apparently" child pornography. But to conclude from that slim evidence that on the day of the search there would be child pornography at his house (other than that delivered), a number of inferences would have to be drawn. An inference would have to be drawn from the fact that advertising materials were addressed to "P. Webber" that Weber had ordered them. But even if Weber had ordered them, they never were delivered to his house. So an inference

would then have to be drawn from Weber's abortive order that the abortive order was not the only order he had placed and that other orders had been made and received. But that would not necessarily place the fruits of those other orders at his house; it would have to be inferred further that although Weber had received a letter from Customs notifying him that it had intercepted a package apparently containing contraband, Weber nonetheless kept other such contraband in his house and made no attempt to dispose of it or move it to a less likely location. Each of these inferences standing alone may be reasonable. But with each succeeding inference, the last reached is less and less likely to be true. Virtual certainty becomes probability, which merges into possibility, which fades into chance. The fourth amendment requires a "fair probability" that the items searched for will be found. *Rabe*, 848 F.2d at 997.

The government contends that although the chain of inferences it drew might seem unreasonable from a lay perspective, the expert testimony in the affidavit showed that the search was reasonable. It is well established that expert opinion may be presented in a search warrant affidavit. *See Seybold*, 726 F.2d at 504. But if the government presents expert opinion about the behavior of a particular class of persons, for the opinion to have any relevance, the affidavit must lay a foundation which shows that the person subject to the search is a member of the class.

In this case, the "expert" testimony in the affidavit was foundationless. It consisted of rambling boilerplate recitations designed to meet all law enforcement needs. It is clear that the "expert" portion of the affidavit was not drafted with the facts of this case or this particular defendant in mind. Agent Burke reported that detective Dworin knew the habits of "child molesters," "pedophiles," and "child pornography collectors" and that from his knowledge of these classes of persons he could expect certain things to be at their houses, from diaries to sexual aids to photo developing equipment.[7] But there was not a whit of evidence in the affidavit indicating that Weber was a "child molester." And the affidavit does not say how many magazines or pictures one must buy in order to be defined as a "collector." It goes without saying that the government could not search Weber's house for evidence to prove Weber was a collector merely by alleging he was a collector. Had agent Burke taken the time and conscientiously drafted an affidavit tailored to what he knew about Weber rather than submitting an affidavit describing generally information about different types of perverts who commit sex crimes against children, he might have realized that he did not know enough about Weber to state that there was reason to believe that Weber was one of the "types" described or possessed any of the habits ascribed to such types. He might have known that a blunderbuss warrant was unjustified.

The government argues that our decision in *Rabe* provides authority for the warrant. There, as in this case, the investigation of the defendant in a child pornography case began approximately two years before the seizure of the packages addressed to the defendant from overseas. *Rabe* 848 F.2d at 995. There, as in this case, the affidavit contained expert opinions on the behavior of pedophiles. *Id.* But there the similarities end. In *Rabe*, approximately two months before the date of the warrant, the defendant wrote a letter to an undercover agent stating that he had a collection of nudist magazines containing photographs of pre-pubescent girls. *Id.* In a letter dated two weeks before that, he said he was "an avid photographer" in the context of a correspondence relating to his interest in "viewing children's physical development." *Id.*

There are three significant distinctions between this case and *Rabe*. First, in *Rabe* there was concrete evidence that the defendant had pornography in his home shortly

---

7. All of these things were asked for in the warrant on a basis even flimsier than the basis on which the government sought to search for the pornographic magazines at issue here. None were found.

before the warrant was executed. *Id.* Second, there was expert testimony in the affidavit which addressed the facts of the defendant's case and specifically concluded that based on those facts, the defendant was a pedophile. *Id.* at 996. Finally, not only did the expert review the defendant's file, but there was enough information to make a judgment as to whether the defendant fit the profile of a "pedophile." The defendant's admitted collection of child pornography and his desire to take photographs were known to the expert and the magistrate before the warrant issued. The facts in *Rabe* thus stand in sharp contrast to the facts here. The affidavit presented in this case, unlike the one in *Rabe*, is so shabby that to argue *Rabe* controls verges on frivolous.

### IV.

■ Our finding that the warrant was broader than could be justified by the probable cause on which it was based does not mean that the evidence obtained must necessarily be suppressed. Under *United States v. Leon*, 468 U.S. 897, 913, 104 S.Ct. 3405, 3415, 82 L.Ed.2d 677 (1984), the evidence should not be suppressed if the government acted in "good faith," which means with objective reasonableness. "It is necessary to consider the objective reasonableness not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it[.]" *Id.* at 923 n. 24, 104 S.Ct. at 3420 n. 24. The objective standard "requires officers to have a reasonable knowledge of what the law prohibits." *Id.* at 919–20 n. 20, 104 S.Ct. at 3419 n. 20. An officer does not "manifest objective good faith in relying on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 923, 104 S.Ct. at 3421 (internal quotations and citations omitted). The rationale behind *Leon* is that since law enforcement officers are not lawyers and since they must often make "hurried judgment[s]," *id.* at 914, 104 S.Ct. at 3416, courts should not exclude probative evidence when officers make reasonable mistakes in obtaining a warrant. Thus we have held that one factor in determining whether the warrant was obtained reasonably is whether the officer submitted the application to a prosecuting attorney for review. *See Ortiz v. Van Auken*, 887 F.2d 1366, 1368–71 (9th Cir.1989). Using the same reasoning, we conclude that another relevant factor is the time pressure under which the officer was operating when he prepared the warrant application.

In this case, Agent Burke did not seek the advice of a United States attorney. Moreover, at the time Burke applied for the warrant, the law was clear that a warrant could not be broader than the probable cause on which it was based. *See Vonder-Ahe; Hillyard.* And particularly significant is that since the government planned the undercover delivery of the items that provided the occasion for the search, the government had complete control over the timing of the search. Under these circumstances, there was no need for the "hurried judgment" upon which law enforcement decisions must often be based. *Cf. Leon.* Although we do not question the subjective good faith of the government, it acted entirely unreasonably in preparing the affidavit it presented. The foundationless expert testimony may have added fat to the affidavit, but certainly no muscle. Stripped of the fat, it was the kind of "bare bones" affidavit that is deficient under *Leon*, 468 U.S. at 926, 104 S.Ct. at 3422.

The district court should have suppressed the evidence seized pursuant to paragraph 2 of the warrant.

REVERSED.