USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

Nos. 98-1412
 98-1819

 UNITED STATES,

 Appellee,

 v.

 ROBERT A. VIGEANT,

 Defendant, Appellant.

 APPEALS FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF RHODE ISLAND

 [Hon. Mary M. Lisi, U.S. District Judge]

 Before

 Torruella, Chief Judge,
 Campbell, Senior Circuit Judge,
 and Stahl, Circuit Judge.
 
 
 
 
 John A. MacFadyen for appellant.
 Richard W. Rose, Assistant United States Attorney, with whom
Margaret E. Curran, United States Attorney, was on brief for
appellee.

May 14, 1999

 
 

 STAHL, Circuit Judge. Defendant-appellant Robert A.
Vigeant appeals his conviction for being a felon in possession of
a firearm in violation of 18 U.S.C. 922(g)(1). For the reasons
that follow, we vacate the conviction and remand to the district
court for proceedings consistent with this opinion.
 I.
 Facts
 The following facts are largely undisputed. Vigeant, a
convicted felon, lived primarily at 24 Newport Lane, Narragansett,
Rhode Island. In March of 1995, he opened a personal bank account
at Fleet Bank. On the application for the account, he listed his
previous employer, but left blank the space calling for the name of
his current employer. Fifteen months later, on June 12, 1996,
Vigeant opened two business accounts at the same bank. He made an
initial deposit of $19,000 into one of the accounts in a mix of
large and small bills. He then immediately transferred $18,500 of
this amount from one business account to the other. Vigeant
promptly filed the Currency Transaction Report (CTR) required by
the Treasury Department for currency transactions exceeding
$10,000. On July 17, 1996, Vigeant deposited an additional
$39,231.59 in the form of a cashier's check into one of the
business accounts. He made no attempt to disguise the electronic
or paper trail of either transaction.
 Beginning some time in 1995, the government launched an
investigation of a drug dealing ring headed by Patrick M. Vigneau. 
Although the government never did charge Vigeant in connection with
the Vigneau conspiracy, Vigeant was a target of this investigation. 
On September 8, 1995, the government obtained a phone book
belonging to Vigneau. The phone book contained a listing for
Vigeant, who had known Vigneau since grammar school. Also in the
phone book, there were several scrap pages on which names and
initials -- among them "Bobby V." and "B.V." -- were listed
alongside various numbers, apparently dollar figures. No dates
accompanied the information. A confidential informant (CI), of
whose criminal record and general unreliability the government was
aware, informed the investigating agents, inter alia, that the
numbers and names memorialized drug deals, and that "B.V." and
"Bobby V." referred to Vigeant. Subsequently, the government
obtained an indictment under seal charging Vigneau and six others
-- but not Vigeant with money laundering and drug distribution
offenses. 
 On May 9, 1997, nearly a year after the Fleet Bank
business account transactions and shortly before the sealed Vigneau
indictment was to be made public, agents of the DEA, IRS and ATF
obtained search warrants for Vigeant's residence at 24 Newport
Lane, and for Vigneau's residence at 25 Kulas Road in West Warwick,
Rhode Island. Both warrant applications were supported by the same
nine-page affidavit prepared by Special Agent Botelho of the IRS. 
The vast majority of statements in the affidavit concerned activity
related to Vigneau that had occurred two years earlier;
approximately two pages' worth of information related to Vigeant,
none of it more recent than seven months. Because this warrant is
at the heart of Vigeant's appeal, we reproduce the portions of the
supporting affidavit relevant to Vigeant in their entirety:
 3 [Botelho avers that he is case agent
 in the investigation of the Vigneau drug
 distribution and money laundering conspiracy.]
 Charles ETHIER and Robert VIGEANT are subjects
 of the investigation but have not yet been
 charged. The investigation continues into
 ETHIER, VIGEANT, and others.
 . . .
 6 This affidavit is submitted in
 support of the application for warrants to
 search the following residences:
 . . .
 b. 24 Newport Lane, Narragansett, RI, a two-
 story, wooden, residential structure, brown in
 color. This home is the residence of Robert
 VIGEANT and business address of Versatile
 Investment Group, Inc. and City Wide, L.L.C. 
 7 The [Vigneau] indictment covers a
 marijuana and money laundering conspiracy
 which began in February 1995 and terminated in
 or about December 1995 . . . .
 14 Among those listed in the drug
 ledger[, the phone book seized previously from
 Vigneau,] is Robert VIGEANT. THE CI has
 informed me that in August of 1995 he received
 $10,000 in cash from VIGEANT for payment of a
 load of marijuana. That transaction is one of
 those listed in the drug ledger maintained by
 Vigneau. VIGEANT is listed in at least one
 other transaction in the ledger.
 21 The evidence indicates that Robert
 VIGEANT has created front companies to
 personally launder his profits. In March
 1995, Robert VIGEANT opened a personal bank
 account at Fleet Bank. He listed his
 occupation as unemployed. Also during 1995,
 as stated above, VIGEANT was engaged in drug
 trafficking. VIGEANT has not filed tax
 returns for 1995 and 1996.
 22 On June 12, 1996, VIGEANT opened
 two business bank accounts. One was in the
 name of Versatile Investment Group, Inc., and
 the other was in the name of City Wide L.L.C. 
 ROBERT VIGEANT lists himself as the President
 of both companies. The business address is
 listed as 24 Newport Lane, Narragansett, RI. 
 The bank records are mailed each month to this
 business address.
 23 On June 12, 1996, VIGEANT deposited
 $19,000 in cash into a newly opened account in
 the name of Versatile Investment Group. The
 cash was in small bills. On the same day,
 June 12, 1996, he transferred $18,500 from the
 Versatile Investment Group, Inc. account to
 the City Wide L.L.C. account. This appears to
 have been a layering transaction, with no
 apparent benefit for breaking the transaction
 into two transactions. In addition to the
 $19,000 cash deposit, VIGEANT deposited a
 cashier's check on July 17, 1996. The
 cashier's check was in the amount of
 $39,231.59.
 24 Within two months of opening these
 accounts, VIGEANT invested $25,000 of the
 funds. He made a down payment on a 42-foot
 pleasure boat, and he made a down-payment on a
 piece of investment real estate.
 25 Based on the foregoing, there is
 probable cause to believe that Robert VIGEANT
 has laundered drug profits in violation of 18
 U.S.C. 1956 by concealing assets derived
 from illegal drug sales and evidence of this
 concealment . . . will be found at VIGEANT's
 home and business address at 24 Newport Lane,
 Narragansett, RI, 02882.

The warrant authorized the agents to look for all "original bank
records or copies" of Vigeant's business and personal accounts at
Fleet Bank.
 Based on this warrant, the agents raided Vigeant's home
at dawn on May 12, 1997. They knocked, waited five to ten seconds,
and then used a battering ram to break down the door. Vigeant was
handcuffed and placed half-naked in a chair in his bedroom. During
their search, agents found a pistol in the night stand and another
weapon located behind a downstairs liquor cabinet. Though he was
never charged with either money laundering or drug conspiracies,
Vigeant was indicted on two counts of being a felon in possession
of a firearm (the pistol and the second weapon, respectively) and
one count of possessing ammunition (in the loaded guns).
 II.
 Trial
 On July 10, 1997, Vigeant filed a motion to suppress the
seized guns and ammunition because the search warrant was defective
for failing to have established probable cause. The district court
denied the motion. The court acknowledged that there was very
little and perhaps no evidence of a continuing drug conspiracy. 
Nevertheless, because the bank records were potential evidence of
money laundering, and because the affidavit stated in a general way
that criminals engaged in money laundering tend to keep such
records, and because the records were continuously mailed to
Vigeant in the two years' elapsed time between the drug evidence
and the search, the court found that the warrant established
probable cause that the bank records the government sought were
still in the house.
 On September 2, 1997, Vigeant filed a motion for a
hearing under Franks v. Delaware, 438 U.S. 154, 155 (1978) (giving
defendants a right to a hearing to challenge the truthfulness of
statements made in an affidavit supporting a warrant application,
provided that the defendant makes a "substantial preliminary
showing" of a deliberate falsehood or affiant's reckless disregard
of the truth). Vigeant alleged that the affidavit contained false
and misleading information supplied by affiant Botelho in reckless
disregard for the truth. The motion was denied. The district
court found that there was independent corroborating evidence of
the CI's information regarding Vigneau, which made his unreliable
record unimportant. The court also found that all of the facts
regarding the "front companies" were true, though scanty. After a
change in Vigeant's counsel, a motion to reconsider was filed,
which was also denied.
 A jury convicted Vigeant of possessing the downstairs
weapon and the ammunition, but not the pistol from the bedside
table. The government then moved to dismiss the ammunition count
as duplicative. Vigeant was sentenced to a lengthy prison term.
 After the sentence and a timely appeal, Vigeant's counsel
spoke with the CI, who recanted substantial portions of what he had
told the affiant. On the basis of this new information, Vigeant
filed a "Motion for Further Franks Hearing Based on Newly
Discovered Evidence." The district court treated the filing as a
motion for a new trial, which it denied. Vigeant appealed the
denial pro se. The two appeals were consolidated in the present
action.
 III.
 Probable Cause
 Vigeant argues that the affidavit offered in support of
the application for a warrant to search his house at Newport Lane
did not demonstrate probable cause. We agree. 
 We review the question of probable cause de novo, see
Ornelas v. United States, 517 U.S. 690, 699 (1996), assessing the
information provided in the four corners of the affidavit
supporting the warrant application, see United States v.
Khounsavanh, 113 F.3d 279, 283 & n.1 (1st Cir. 1997). The
information provided must "warrant a man of reasonable caution in
the belief that an offense has been or is being committed." 
Brinegar v. United States, 338 U.S. 160, 175-76 (1949) (internal
quotation marks omitted). "Probability is the touchstone." 
Khounsavanh, 113 F.3d at 283. "Probable cause exists when the
affidavit upon which a warrant is founded demonstrates in some
trustworthy fashion the likelihood that an offense has been
committed . . . ." United States v. Schaefer, 87 F.3d 562, 565
(1st Cir. 1996) (internal quotation marks omitted). "[M]ere
suspicion, rumor, or strong reason to suspect [wrongdoing]" are not
sufficient. United States v. Han, 74 F.3d 537, 541 (4th Cir. 1996)
(citation omitted).
 We will limit our inquiry to whether there was probable
cause to believe that Vigeant had committed the crime of laundering
drug proceeds in violation of 18 U.S.C. 1956, as alleged in the
affidavit. We assume for present purposes that there was probable
cause that the evidence (in the form of bank records) of such a
crime would be found at 24 Newport Road. See United States v.
Zayas-Diaz, 95 F.3d 105, 110-11 (1st Cir. 1996) (A "warrant
application must demonstrate probable cause to believe that a
particular person has committed a crime--'the commission element'--
and that enumerated evidence relevant to the probable criminality
likely is located at the place to be searched--'the "nexus"
element.'") (emphasis in original). We hold that the "commission"
element of the probable cause inquiry was not satisfied, for three
reasons: (1) there is no link, temporal or otherwise, between the
alleged drug dealing and the bank activity that took place more
than six months later; (2) the banking and investment activity was
not itself of a character sufficient to establish that the
"proceeds of some form of unlawful activity," 18 U.S.C. 1956,
were involved; and (3) the conclusory statements of the affiant
that might otherwise have helped create probable cause are entirely
without factual support.
 Links to Drug Activity. In total, the affidavit states
that Vigeant was involved in at least one drug transaction that
took place two years before the warrant application was submitted
and six months before the allegedly suspicious financial
transactions. This information was based on the word of a
confidential informant, whose reliability and credibility is
neither supported nor referred to in the affidavit. There are no
"self-authenticating" details, such as extensive description, that
would suggest the report was not simply made up. See Zayas-Diaz,
95 F.3d at 111. Nor is there any indication that affiant Botelho
had other information independently corroborating the CI's
information so as to bolster the lack of a showing of reliability. 
See Gates, 462 U.S. at 233. Indeed, the government's failure to
indict Vigeant along with Vigneau suggests that the government had
insufficient evidence of drug dealing activity on Vigeant's part. 
In any case, at the suppression hearing, the district court aptly
pointed out that there was virtually no evidence of a continuing
pattern of drug transactions.
 Even if there were such evidence in the affidavit, there
is simply no connection between the alleged drug activity (and any
proceeds therefrom) and the banking transactions. There was a
significant temporal gap between the two events. The amounts
deposited were not similar to those involved in the drug
transaction in which the CI had participated in 1995, nor to the
numbers in the "drug ledger" next to Vigeant's initials. The
affidavit itself says that the drug distribution conspiracy in
which Vigeant was supposed to have played a part "terminated in or
about December 1995" -- well before the deposits alleged to be
layering. Thus, we conclude that the government was unable to
identify with factual particulars any illicit source that might
cast doubt on otherwise legal 1996 transactions.
 Banking and Investment Transactions. As we noted above,
the alleged laundering itself took place six months after the
meager evidence of past drug trafficking and well after the
affidavit itself says the Vigneau conspiracy terminated. Absent
any link between the drug activity and the banking transactions,
the activity suggesting laundering comprised (1) the fact that the
defendant made a deposit of small bills in a bank account, the bulk
of which he moved on the same day to another bank account within
the same bank, (2) the fact that Vigeant was not employed outside
his two businesses, and (3) the "fact" -- which later proved untrue
-- that the defendant had not filed tax returns for 1995 and 1996. 
The affidavit does not aver that Vigeant tried to hide any of the
1996 transactions. It does not say what steps, if any, the
government took to establish the source of the funds. In the
absence of any link to an illicit source, see supra, the only
material fact alleged in the affidavit relative to the nature of
the banking transactions themselves that has a suspicious cast is
the reference to "small bills." While somewhat suspicious, this
single factor is inadequate, either alone or taken in light of the
other allegation, to establish probable cause that the funds were
the proceeds of unlawful activity under the money laundering
statute. 
 The fact that Vigeant subsequently invested a portion of
the money in a boat and real estate nudges us no closer to the
conclusion that "probable criminality" occurred. For one thing,
like the banking activity, there were no allegations that suggest
the purchases were made with the proceeds of unlawful activity. 
Second, activity of this type could be consistent with legitimate
business that might be transacted by a company named Versatile
Investment Group; that is, legitimacy is at least as reasonable an
inference from the allegations as is criminal activity. For these
reasons, we do not see how this information makes more probable the
conclusion that money laundering occurred. As we have said,
probability is the touchstone, and here there is no more than a
remote, speculative possibility that the Vigeant affidavit
evidenced money laundering activity.
 Agent's Conclusions. There are, of course, the
conclusory statements of the affiant Botelho that the activity
described constituted "layering" and that the business accounts
were for "front companies." Normally, where there is evidence to
support the conclusions of an experienced officer, we accord those
conclusions some weight. See United States v. Hoffman, 832 F.2d
1299, 1306 (1st. Cir. 1987). Here, we find no evidence that
supports any part of the officer's conclusion. He does not, for
example, indicate whether he sought to find some legitimate benefit
for breaking the transaction into two transactions. He does not
claim that Vigeant tried to hide the nature of these transactions. 
He does not argue that Vigeant attempted to structure the 1996
deposits in order to evade reporting requirements (with which
Vigeant in fact complied). He indicates no investigative steps
that brought him to the conclusion that Vigeant's businesses were
"front companies," such as monitoring Vigeant's activity (or
inactivity), even though the agents had conducted extensive
surveillance of Vigeant's home. Nor does the government -- below
or on appeal -- offer any evidence or investigation in this regard. 
Indeed, the district court wryly concluded that the affidavit was
"not loaded with facts to support" the idea that Vigeant's
businesses were "front companies." In sum, Botelho's unsupported
conclusions are not entitled to any weight in the probable cause
determination. See Gates, 462 U.S. at 239 ("Sufficient information
must be presented to the magistrate to allow that official to
determine probable cause; his action cannot be a mere ratification
of the bare conclusions of others."); Aguilar v. Texas, 378 U.S.
108, 113-14 (1964) (affidavit that provides affiant's conclusions
without also providing some underlying factual circumstances is
equivalent to the "bare bones" affidavits rejected in, inter alia,
Nathanson v. United States, 290 U.S. 41 (1933)).
 For the three reasons stated above, we conclude that the
affidavit failed to establish probable cause to search 24 Newport
Lane for evidence of money laundering. Cf. Gates, 462 U.S. at 236
(requiring that affidavit include particularized facts indicating
that a search "would uncover evidence of wrongdoing")(emphasis
added).
 IV.
 Good Faith
 In United States v. Leon, the Supreme Court held that
even in the absence of probable cause, the exclusionary rule should
apply only where excluding evidence would have a substantial
deterrent effect on the police. See 468 U.S. 897, 906, 918 (1984). 
Thus, the police are not entitled to rely on a warrant where, inter
alia, the issuing magistrate "was misled by information in an
affidavit that the affiant knew was false or would have known was
false except for his reckless disregard of the truth." Id. at 924. 
The Court called for a case-by-case analysis of this inquiry. Id.
at 918. We believe this is a case in which excluding the evidence
will have a substantial deterrent effect on the police. Our
conclusion rests on the fact that a finding of good faith is
inconsistent with the numerous material omissions excluded from --
and false and misleading statements included in -- the underlying
affidavit. Cf. id. at 923 (citing Franks, 438 U.S. at 154). 
Because of the fact-intensive, case-by-case nature of this inquiry,
we detail at length the factual basis for our conclusion.
 In doing so, we focus on the good faith of affiant and
warrant applicant Botelho, because the Supreme Court expressly
stated that "[i]t is necessary to consider the objective
reasonableness, not only of the officers who eventually executed a
warrant, but also of the officers who originally obtained it or who
provided information material to the probable-cause determination." 
Leon, 468 U.S. at 923 n.24. Thus, in Malley v. Briggs, the Court
held that the relevant question was "whether a reasonably well-
trained officer in petitioner's position would have known that his
affidavit failed to establish probable cause and that he should not
have applied for the warrant." 475 U.S. 335, 345 (1985). "[I]f
no officer of reasonable competence would have requested the
warrant, i.e., his request is outside the range of professional
competence expected of an officer," id. at 346 n.9, then the fact
that the magistrate approved the application is of no help to him. 
The applying officer "cannot excuse his own default by pointing to
. . . the magistrate." Id.; see also United States v.
Ricciardelli, 998 F.2d 8, 16 (1st Cir. 1993). For this reason, the
government's suggestion that we must accord deference to the
probable cause finding of the magistrate is misplaced in this case.
 We have followed the Supreme Court's guidance in like
circumstances. In Ricciardelli, we found the Leon good-faith
exception inapplicable where the shortcomings in probable cause
were attributable to "the inspectors' omissions in the warrant-
application process." 998 F.2d at 16. In United States v.
Fuccillo, 808 F.2d 173, 178 (1st Cir. 1987), we held that the 
good-faith exception was not available where, "with regard to the
affidavit prepared for the warrant . . ., the agents were reckless
in not including in the affidavit information which was known or
easily accessible to them." 
 Accordingly, we begin by examining whether the government
has shown objective good faith on the part of affiant Botelho. 
Cf. United States v. Reilly, 76 F.3d 1271, 1280 (2d Cir. 1996)
(examining good faith of affiant, where affiant omitted material
facts and gave information that, while not false, was "almost
calculated to mislead"); United States v. Weber, 923 F.2d 1338,
1346 (9th Cir. 1990) (examining good faith of affiant and finding
none); United States v. Baker, 894 F.2d 1144 (10th Cir. 1990)
(same). As in Ricciardelli, we conclude that the government has
not met its burden. Specifically, Botelho's numerous omissions of
material facts were at least reckless. See Reilly, 76 F.3d at 1280
(citing Rivera v. United States, 928 F.2d 592, 604 (2d Cir. 1991)
for proposition that "recklessness may be inferred when omitted
information was 'clearly critical' to assessing the legality of the
search"). An enumeration of Botelho's omissions follows. 
 First, and most important, Botelho neglected to mention
the CI's long criminal history, his numerous aliases, his recent
plea agreement, and other indicia of his unreliability. Cf.
United States v. Baxter, 889 F.2d 731, 734 (6th Cir. 1989) (barring
application of the good-faith exception where affiant implied that
CI was credible and reliable when affiant had no basis for the
implication). Second, Botelho failed to note that Vigeant had
filed the necessary CTR, yet included such minute details about the
transaction as that it involved "small bills" -- a fact he
presumably obtained from the CTR. Filing a CTR, like failing to
"structure" the transaction to avoid the reporting requirement, is
evidence manifestly inconsistent with money laundering. Third,
Botelho mentioned an additional deposit by cashier's check, but
neglected to say that Vigeant's grandmother, who was above
suspicion in this case, was the purchaser of the check. Fourth,
Botelho could have (but did not) obtain Vigeant's employment status
from the probation office, apparently deciding instead to infer
(without informing the magistrate that he had done so) Vigeant's
present unemployment from a blank space marked "current employment"
on a two-year-old bank application. Fifth, Botelho stated that
"the evidence indicates that Robert Vigeant has created front
companies," which implies the existence of underlying evidence not
disclosed. Such evidence did not, in fact, exist. Sixth, Botelho
stated that the CI "identified" the $10,000 transaction in the
"drug ledger," when in fact the CI only identified Vigeant by his
initials and suggested that the numbers listed next to the initials
represented dollar amounts, none of which was $10,000. Sixth, the
government failed to note that the supposed "pleasure boat"
mentioned in the affidavit was, in fact, a stripped-down craft in
poor condition in need of considerable repair and refurbishing
before it could be sold at a profit. Seventh, the affidavit
implies that the CI personally witnessed a marijuana transaction
and personally received $10,000; neither is true. According to the
contemporaneous DEA Report of Investigation on which the affidavit
was based, the CI in fact said that Vigeant gave Vigneau 
approximately $4,000, which Vigneau then gave to the CI. The CI
does not report witnessing an exchange of marijuana.
 Moreover, as we indicated at length in several of
Botelho's statements -- regarding "front companies" and "layering"
-- were "foundationless expert testimony." United States v. Weber,
923 F.2d 1338, 1346 (9th Cir. 1990). Such circumstances weigh
against our finding objective good faith. See id.; see also State
v. Thompson, 369 N.W.2d 363, 372 (N.D. 1985) (no good faith,
because "the affidavit in the instant case does not supply anything
more than a most tenuous and conclusory suggestion that the
[defendants] were involved in criminal activity").
 The government offers no rational explanation for these
omissions and foundationless conclusions. Instead, the government
argues in its brief -- with information obtained after the search
in question -- that Vigeant is a bad person. Be that as it may,
even unsavory persons have constitutional rights. We conclude that
a reasonable officer in Botelho's position -- that is, in
possession of the omitted information -- would have known that he
"should not have applied for the warrant," Malley, 475 U.S. at 345,
at least not without further investigation.
 This case is similar to United States v. Weaver, 99 F.3d
1372 (6th Cir. 1996). Based on information from a reliable CI, the
officer in Weaver prepared an affidavit that stated an address and
description of the house to be searched and recited that the CI had
personally observed -- within the prior three days -- a quantity of
marijuana controlled by the defendant "for the purpose of
distribution." The magistrate issued the warrant and the police
discovered numerous firearms on the described property. At trial,
Weaver moved to suppress on the ground of lack of probable cause. 
The district court denied the motion, finding, inter alia, the
averments in the affidavit were not false.
 The Sixth Circuit reversed, finding that 
 the only claim of possible wrongdoing [in the
 affidavit] is the averment that, within three
 days prior to the affidavit date, the
 informant was on the suspect premises and,
 while there, he saw some quantity of marijuana
 "expressly for the purpose of unlawful
 distribution." [The affiant] presents no
 underlying factual circumstances to support
 the informant's knowledge regarding
 distribution, nor the detective's own "belief"
 that these quantities of marijuana were
 present "for the purpose or with the intention
 of unlawful possession, sale, or
 transportation."
 
Weaver, 99 F.3d at 1378 (quoting affidavit; citations to record
omitted). The officer had excluded the underlying factual
circumstances in order to protect the identity of the CI. 
 In the present case, we have no recency of first-hand
observation of wrongdoing, no plausible excuse for omitting the
material, and no informant on the premises who was first-hand
witness to the wrongdoing cited in the warrant application -- in
this case, money laundering. It follows then, in light of the more
egregious circumstances in our case, that we also must vacate the
conviction here.
 In holding today that the good faith exception does not
apply, we emphasize that our holding is limited to the facts of
this particular case, where we have determined that exclusion would
serve as an effective deterrent. See Leon, 468 U.S. at 918. We
certainly do not hold that every unexplained exculpatory material
omission in an affidavit necessarily warrants a finding of a lack
of good faith.
 V.
 Conclusion
 For the foregoing reasons, the judgment of conviction is
vacated, and the case is remanded to the district court for
proceedings consistent with this opinion.