**UNITED STATES of America,
Plaintiff,**

**v.**

**Donad M. CARLSON, Defendant.**

**Criminal Case H–99–178.**

United States District Court,
S.D. Texas.

June 28, 2002.

Michael W. Schultz, Assistant U.S. Attorney, Houston, TX, for Plaintiff.

Joel M. Androphy, Houston, TX, for Defendant.

## Opinion on Suppression

HUGHES, Judge.

### 1. *Introduction.*

This case co-mingles the novel—the Internet, chat rooms, user names—with the venerable—freedom from random government searches. When a federal agent bases his affirmation on dubious information from an unreliable source, the ensuing warrant is invalid, and so is the search.

### 2. *Search Warrants.*

Freedom from general searches is a fundamental right, and search warrants issue only on probable cause. U.S. CONST. amend. IV; *see Marron v. United States,* 275 U.S. 192, 195, 48 S.Ct. 74, 72 L.Ed. 231 (1927). Before a magistrate may issue a warrant, the officer must supply her with facts under oath. These facts must be of a weight and reliability that would lead a reasonable person learned in the law to conclude that the law has prob-

ably been violated. *See Steele v. United States*, 267 U.S. 498, 504–05, 45 S.Ct. 414, 69 L.Ed. 757 (1925); *Stacey v. Emery*, 97 U.S. 642, 645, 24 L.Ed. 1035 (1878). Next, the facts must support the conclusion that the specific items relate to the commission of that crime and are to be found in the place to be searched. *See Aderhold v. United States*, 132 F.2d 858, 859 (5th Cir. 1943); *United States v. Maestas*, 546 F.2d 1177 (5th Cir.1977). Then the warrant must describe—in a particularity congruent with the supporting facts—the place to be searched and the things to be seized. U.S. Const. amend. IV; *see United States v. Shugart*, 117 F.3d 838 (5th Cir.1997). When the false, irrelevant, nonspecific parts of an application are eliminated, what remains must support a finding of probable cause. *See Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Abstract psycho-sociological "data" is insufficient. A warrant that describes items for seizure beyond the hard information in the application is invalid. A warrant clothed in mindless enumeration of baseless specifics is still a general warrant—still void.

### 3. *Affidavit for the Search Warrant.*

■ Special Agent Robert M. Sherman of the United States Customs Service filed an affidavit on March 12, 1998, supporting an application for a search warrant for Don M. Carlson's home.

### A. *Probable Cause.*

Based on information an informant, Harry Conners, sent to Customs on October 29, 1997, Sherman swore that Carlson sent two pornographic images of children through the Internet on October 4, 1997, and received two more images through the Internet on October 23, 1997. Sherman did not specify from whom Carlson received the images or to whom he sent them. Further, Sherman made no statement about the informant's veracity, reliability, or the basis of his knowledge.

Sherman corroborated that the screen names used to receive and send the images were Carlson's, concluding that the fictitious names concealed his identity so he could communicate anonymously with young boys. Sherman then verified that the children in the images were minors and that their poses were pornographic.

Last, Sherman said that he monitored Carlson in an Internet chatroom at 11:00 p.m. on February 28, 1998, baldly asserting that the chatroom was frequented by homosexual males interested in young boys. Sherman said he arrived at Carlson's home at 11:45 p.m. and saw lights on inside the house and Carlson's car parked in the driveway. He stated that Carlson disconnected from the Internet at 11:50 p.m. Sherman said he knocked on Carlson's door forty minutes later, and Carlson answered.

Sherman then exerpted six pages from another agent's study of pedophiles, child pornographers, and preferential child molesters. He included details of how pedophiles seduce and molest children. He said that computers were a fast-growing medium for pedophiles. None of this—none—was case-specific. Sherman never connected the profiles to Carlson or the information Conners provided. He never alleged that Carlson was a pedophile. He described the behavioral patterns of pedophiles and child molesters without describing how Carlson fit the patterns.

### B. *Particularity.*

Beyond computerized images, Sherman's catalogue of items he wanted to seize included films, videotapes, books, and magazines containing child pornog-

raphy. He listed items like envelopes, letters, and address books used to send and receive child pornography through the mail, plus "all computer systems," including scanners, operating manuals, monitors, and printers—none of which can store electronic images.

Sherman continued, wanting to seize motion picture cameras, production equipment, still cameras, camera film, and video cassette recorders and players. He also listed receipts, checks, money orders, contracts, and invoices that could be used to distribute pornography. He wanted to seize advertisements, posters, pamphlets, lists, or notebooks that contained a reference to child pornography. He also wanted to seize all records showing that Carlson owned the home or the seized items.

Sherman said he wanted to seize child erotica, even legal, that demonstrated Carlson's disposition toward pedophilia. This included items Carlson could use to entice children to visit or trust him— books about children or pedophiles, toys, dolls, games, children's books, and video games.

Out of eleven paragraphs, Sherman addressed the issue at hand—computer images sent over the Internet—in only one. With some particularity in paragraph six, Sherman said he wanted to seize computer files with images of child pornography. None of the other items had been shown to be part of anything Sherman "knew" about Carlson or his home. Sherman's indiscriminate list was far too broad. *See Stanford v. Texas,* 379 U.S. 476, 485, 486, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965).

4. *No Probable Cause.*

A. *Unreliability of the Confidential Informant.*

■ When probable cause for a search warrant is based on a confidential informant's information, the magistrate must assess the informant's reliability. Otherwise, the government could search the home of whomever it wanted with ficticious or unreliable information. One lying citizen could unleash the full force of the state and its ability to disrupt someone's home. Reliability can be assessed by considering the informant's record in other cases and considering additional evidence that corroborates the reliability of the informant's material. *See Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

Although it is clear that no one could have asserted anything useful about Conners, Sherman never averred that Conners was truthful or that his information was reliable. Even though Sherman had the government's resources at his disposal, he never furnished evidence that would have indicated Conners's character or corroborated his information, the veracity of which is suspect at best.

Sherman says that Carlson's activity in the chatroom corroborates Conners's story, making the information reliable. The chatroom Carlson frequented was legal, so his presence there corroborates no illegal activity. Second, the claim that people who use the chatroom are homosexual pedophiles seeking to molest young boys is wholly speculative. Sherman presented no evidence whatsoever to this effect. Third, Connors frequented the same chatroom. Under the government's analysis, Connors would be a homosexual male interested in young boys. Even assuming the chatroom were illegal, Sherman presented no evidence connecting Conners's information to Carlson's chatroom activity— activity that occurred four months *after* Conners furnished the information to Sherman.

A cursory review of the electronic mail headers that Conners sent to the government reveals that Conners and Carlson were simultaneously receiving the same images from the same third person. Sherman knew this but did not include this data for the magistrate to use in assessing Conners's reliability. He never said how Conners knew that Carlson sent and received the images. He said only that Conners told Customs that Carlson sent and received two images of child pornography.

Conners took 25 days to report that Carlson sent images of child pornography and six days to report that Carlson received images of child pornography. As time passed, Conners's information became more unreliable and his motives more suspect.

Sherman also omitted Conners's criminal record, despite his ready access to the information as a federal officer. Conners has never been convicted, but he has a felony arrest for possession of marijuana and six misdemeanor arrests, including assault with the intent to cause physical injury, driving under the influence of alcohol, and resisting arrest. His brushes with the law should have been considered in assessing his reliability.

In a last ditch effort, the government says that Conners's reliability was not crucial because he was a concerned citizen, not a confidential informant. The assertion contradicts the facts. The government called Conners a "confidential informant" in its affidavit and wanted Conners to remain confidential at the outset of the case. Although the government paid Conners the $200 for his information after the search, Conners knew about the potential reward when he supplied the information.

Sherman did not offer evidence supporting Conners's reliability. He omitted that Conners was *in pari delicto,* had a criminal record, and would be paid for the information.

### B. Irrelevant Stereotypes and Profiles.

The stereotypes and profiles do nothing to show that a search would probably reveal evidence of a crime. Assuming they were true, Sherman did not connect the profiles and stereotypes to Carlson's activities.

### (1) Irrelevant Stereotypes.

Sherman made several blanket assertions that just promote blanket assumptions. He said Internet users with fictitious screen names conceal their identities to communicate with young boys. There are countless reasons for Carlson to wish to remain anonymous, including a wish to talk with others—anonymously—about sex with children. The conversations are neither illegal nor evidence of illegality. Assuming the stereotypes were true, Sherman presented no evidence that Carlson involved these children on the Internet with the images he sent and received.

Sherman also said that homosexual men interested in young boys frequented the chatroom Carlson used. Again, Sherman presented no evidence to corroborate this or that Carlson involved children with the images he sent and received.

### (2) Irrelevant Profiles.

 Sherman explained the profiles of three groups of unwholesome individuals: pedophiles, preferential child molesters, and child pornographers. Ignorant of a crucial distinction—pedophilic acts are illegal, but it is not illegal to be a pedophile—Sherman continued his six-page exegesis on child pornographers and molesters. He even explained, in

detail, how pedophiles seduce children. Evidence about the behavior of a class of people is relevant only if the affidavit shows that the target of the search is a member of the class. Otherwise, the description is mere fluff designed to inflame the passions of the magistrate against the alleged pedophile. *See United States v. Weber,* 923 F.2d 1338, 1345 (9th Cir.1990).

Sherman did not present one scintilla of evidence that Carlson produced child pornography, targeted children for molestation, or was improperly involved with children. If he had scrutinized the facts, as another court has commented, he might have noticed that his boilerplate did not refer to Carlson, the search of Carlson's home, or the likelihood that Carlson fit one of the three profiles. *See id.*

### 5. *No Particularity.*

Assuming Conners's information was reliable, the list of things to be seized was too broad because it sought items used to produce pornography and act as a pedophile. Sherman had only unverified evidence that Carlson sent and received two images of child pornography over the Internet. He had *nothing* evincing pedophilic acts or the production of child pornography.

A search for motion picture cameras, production equipment, still cameras, camera film, and video cassette recorders and players is similarly too broad because Sherman presented no evidence that Carlson did anything suspicious except communicate over the Internet. A search for indicia of trade—envelopes, address books, receipts, checks, or contracts—is too broad because Sherman had evidence linking Carlson only to the Internet. A search for films, videotapes, or magazines with child pornography or advertisements or pamphlets for them is too broad because Sherman had no evidence tying Carlson to these media, and the advertisements are not illegal.

Similarly, a search for toys, dolls, games, books about children, children's books, and video games is ridiculously too broad because Sherman did not present evidence that Carlson involved children in illegal activity. Millions of homes contain children's toys for wholly licit reasons. If there is a relation between possession of children's playthings and possession of child pornography, Sherman did not show it. He certainly did not relate Carlson's possession of these things to images of child pornography.

### 6. *False Representations.*

█ Assuming Conners's information was intrinsically reliable, the omission that Conners was *in pari delicto,* had a criminal record, and would be paid for his information makes Sherman's representations about him misleading. Sherman's testimony in the application for the search warrant must be struck.

With the Conners portions of Sherman's affidavit struck, there is insufficient evidence that a search of Carlson's home would probably reveal evidence of a crime. Without information about Carlson's sending and receiving images of child pornography over the Internet, there is no reason—corroborated or otherwise—to believe that a search of Carlson's home would reveal computer images of child pornography.

### 7. *Stale.*

Sherman received the information from Conners on October 29, 1997, but did not apply for a search warrant until March 12, 1998. The longer the delay, the less likely the information connects its subject to a crime. The government presented no explanation for the lag. The stale information is insufficient to show probable cause.

*See United States v. Freeman,* 685 F.2d 942 (5th Cir.1982).

Assuming Conners's information was initially reliable, its strength evaporated after four and a half months. After striking the irrelevant profiles from Sherman's affidavit, it leaves no reason to believe that Carlson would still have the incriminating images. The likelihood that a person will buy a new computer or replace a hard drive is extremely high. The government admitted that there was no continuing investigation of the people on the headers of the electronic messages Carlson sent and received, so the delay was not necessary to protect potential sources of additional information.

Monitoring Carlson in the chatroom four months after the government received the information neither corroborates Conners's information nor makes it more probable that a search will reveal evidence of a crime. Waiting for Carlson to visit a chatroom is not a reasonable explanation for the delay; it shows the weakness of the connection the government wants to make.

### 8. *Execution of the Search.*

 Sherman executed the warrant in as slapdash a manner as he applied for it. The warrant Sherman used to search Carlson's home did not have attached the list of items he intended to seize. This is a violation of the federal rules, and, more importantly, the Constitution. U.S. CONST. amend. IV; FED.R.CRIM.P. 41(d). Without the list of particular items to be seized, the execution of the warrant was unreasonable because Carlson had no notice. A citizen can confirm that an officer's search is legal only if the warrant particularly describes the place to be searched and the things to be seized. Sherman's warrant did not, contravening the Constitution's requirements.

### 9. *Good Faith.*

 Evidence seized in an illegal search is not suppressed if the officer executing the warrant had an objectively reasonable belief that the warrant was valid. Faith in the warrant's validity is not reasonable where the affidavit wholly lacks the required probable cause showing. *See United States v. Leon,* 468 U.S. 897, 922–23, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Sherman knew that the affidavit lacked specific allegations against Carlson. He knew that the list of items to be seized bore no relation to the evidence he possessed. He knew that his informant was unreliable and *in pari delicto* with Carlson. The magistrate did not tell Sherman that she had edited the proposed warrant to pare it back to what probable cause allowed. *See Massachusetts v. Sheppard,* 468 U.S. 981, 986, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984). Sherman's reliance on the warrant to search Carlson's home was entirely unreasonable.

### 10. *Conclusion.*

Conners was not trustworthy, and his information was unreliable. Sherman acted on Connors's tip without trying to corroborate his information or credibility. Instead, Sherman sat on the information for more than four months, watched Carlson enter a perfectly legal chatroom, and then sought a warrant. Sherman's supporting affidavit academically details the behavior of pedophiles, yet offers no evidence that Carlson acted as one. The affidavit also implied the informant was tried and true,. omitting reference to the $200 payoff or his history of criminal activity. Calling Conners a "confidential informant" grossly misrepresented his true nature. Once the affidavit's false representations are struck, what remains cannot support a finding of probable cause.

The warrant also fails the particularity requirement. Sherman had evidence of one thing—that Carlson possessed computer images containing child pornography. The warrant should have been limited to that. Instead, Sherman's list of articles to be seized included a plethora of unrelated items. Sherman searched Carlson's home hoping to find evidence of crimes he had no good reason to suspect. No reasonable magistrate in the good-faith discharge of her constitutional responsibilities would have authorized this late, superficial, and unconnected warrant. The evidence derived from the search will be suppressed.