Filed 10/28/19

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H045524 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. B1683806) |
| v. | |
| MUHAMMAD KHAN, | |
| Defendant and Appellant. | |

Following a trial, a jury found defendant Muhammad Kahn guilty of arson of an inhabited structure (Pen. Code, § 451, subd. (b)).[1]  The jury found true an enhancement allegation that he committed the arson by use of a device designed to accelerate the fire (§ 451.1, subd. (a)(5)).  Defendant was sentenced to a total term of nine years, which consisted of a five-year term on the arson and a four-year enhancement.

On appeal, defendant challenges the trial court's denial of his motion to suppress evidence obtained through a warrant to search his home.  He contends that the trial court erred because (1) the warrant affidavit did not present a substantial basis for a finding of probable cause and (2) the good-faith exception to the exclusionary rule did not apply.  Defendant also asserts that under the reasoning of *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), this court must remand this case so that the trial court may order pretrial diversion for treatment of his mental health condition pursuant to section 1001.36, which went into effect while his appeal was pending.

We find his contentions without merit.  Based on legislative history, we conclude that section 1001.36, which authorizes pretrial diversion for mental health treatment, does

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

not retroactively apply to defendant, who had been found guilty following a jury trial and is serving his sentence. Accordingly, we affirm the judgment.

## I

### *Evidence*

A. *The Prosecution's Case-in-Chief*

*The Relationship of Defendant and S.S.*

S.S. met defendant in approximately late 2013 when S.S. was working for SAP as part of its start-up-focus program and defendant was an SAP intern. Later, when S.S. was vice president of innovations, S.S. was responsible for getting HanaHaus, which was a work space that was "anchored by a coffee shop in downtown Palo Alto," up and running. HanaHaus was a vision of an SAP founder. It was meant to serve "the broader entrepreneurial community of Palo Alto" and be a place "to hang out and work and be productive."

In approximately March of 2014, S.S. advertised the position of HanaHaus manager, and defendant expressed an interest in the job. Because defendant had done "a pretty good job" as an intern on the projects he had done for S.S. in 2013, S.S. had "no problem" bringing defendant into the HanaHaus project.

On April 1, 2014, defendant began working as the manager of HanaHaus; he reported to S.S. During the planning and construction phases, defendant performed his duties extremely well. Defendant helped S.S. interact with contractors, architects, and people in the Palo Alto community.

Defendant went to S.S.'s house on at least one occasion. In that instance, S.S. had brought defendant over to his house because he was lending bicycles to defendant's sisters, who were visiting from the East Coast. S.S. and defendant loaded the bicycles in S.S.'s car and took them over to defendant's apartment. S.S. believed that defendant had come over to his house one other time, but S.S. could not recall the circumstances.

2

S.S. gave defendant a performance review for 2014. He rated defendant "outstanding" in five of 14 categories and "successful" in the remaining categories. In the category of "teamwork," which refers to "getting along with . . . fellow team members," defendant received an excellent rating for 2014.

In 2014 or as late as January 2015, S.S. wrote a recommendation for defendant in support of his graduate school application.

Defendant's job performance began to "drop quite a bit" as they got close to the launch of HanaHaus. HanaHaus opened in March 2015. After HanaHaus was up and running, S.S. took on the additional responsibility of strategic product development at SAP.

HanaHaus operated with the support of four or five outside contractors. Blue Bottle Coffee ran the coffee shop. Defendant's managerial duties required him to be physically present to run HanaHaus's "day-to-day operations." His duties included ensuring that the contractors "performed their jobs well" and managing reservations for the workspace.

As the manager, defendant was also responsible for handling social media for HanaHaus, including posts on Twitter, Facebook, and Instagram. Defendant was supposed to create "a marketing and communications buzz" and broadly communicate information about HanaHaus. He had exclusive control of HanaHaus's social media accounts.

After HanaHaus opened, his performance "really started to go down," according to S.S. Defendant had "many, many absences," and when asked about his absences, defendant often gave medical reasons for them. Defendant also disappeared from work during the day without telling S.S. or anyone else at HanaHaus that he was leaving. S.S.'s relationship with defendant became frayed because S.S. had his "broader responsibilities" in addition to his responsibility "to run HanaHaus efficiently."

S.S. had received complaints about defendant's behavior from his other HanaHaus staff. One complaint was that defendant allowed people that he knew to use HanaHaus without a reservation and without paying.

Nevertheless, in April of 2015, S.S. signed off on defendant's raise and promotion based on defendant's 2014 performance. At trial, S.S. explained that it took about four months for SAP management to approve recommendations based on the prior year's evaluation.

S.S. informed "HR" that defendant was taking long sick leaves and not showing up for work. In 2015, S.S. gave defendant a memo, dated May 19, 2015, that documented defendant's deficient performance, and S.S. then discussed the memo in person with defendant while an HR manager was on the phone. The memo also addressed improper charges that defendant had incurred on an SAP credit card, including "a very high Uber receipt." S.S. went over a three-month performance plan for defendant. It specified tasks to be done by certain dates and provided for weekly follow-ups. The HR manager asked defendant to read the memo and sign it, but defendant never signed it.

Defendant's job performance did not improve. Defendant continued to take unapproved leaves and vacation time. While supposedly on leave, defendant showed up for at least one event hosted at HanaHaus. In September or October of 2015, S.S. personally informed defendant that he could not be at HanaHaus while on sick leave. Defendant told S.S., "This is a public place" and "I can come and go as I please." S.S. thought defendant's attitude was "[v]ery aggressive" and "[v]ery arrogant." The staff reported to S.S. that defendant was at HanaHaus three or four times. S.S. met defendant there and asked him to leave a couple of times. Defendant did not appear to be sick on those occasions. Defendant did not work most of the time between the end of October 2015 and Thanksgiving.

4

On November 26, 2015, at approximately 2:00 a.m. California time, S.S., who was traveling abroad, received a phone call from the security company responsible for HanaHaus's alarm system. S.S. learned that there had been a possible break-in and that a sensor had indicated "door open," but not "glass breaking." S.S. inferred that someone with a key who did not know the alarm code had gone into HanaHaus. Only S.S. and those who had to enter HanaHaus after closing, such as delivery personnel for Blue Bottle, had the security code for the alarm system. Defendant, as the manager of HanaHaus, had "full clearance to come and go" as he pleased during open hours, but he did not have the security code.

On Monday, November 30, 2015, after S.S. had returned home, he reviewed the security camera recording for November 26, 2015. It showed someone entering HanaHaus from the back parking lot. Although S.S. could not see the intruder's face because he was wearing "some kind of mask," S.S. identified him as defendant based on his body type, his walk, his trousers, and his shoes. Toward the beginning of the recording, S.S. saw defendant, who was wearing a red and white-striped shirt, hunch down at an angle. This movement was consistent with someone unlocking the bolt at the bottom of the doors.

Toward the end of the recording, S.S. saw defendant hop or skip. S.S. subsequently found out that cockroaches had been "thrown" into HanaHaus, which had never before had cockroaches.

On December 1, 2015, the day after S.S. had identified defendant in the security recording, defendant was terminated from SAP. Although S.S. was not the one who actually terminated defendant, S.S. provided the information to HR. S.S. indicated that he feared for his safety at this point because of defendant's level of aggression and his lack of respect for the law or rules. On cross-examination, S.S. agreed that defendant had "never threatened, taunted or intimidated [S.S.] in any way" during "the entire time that [S.S.] worked with him at SAP."

5

After defendant's termination, it was discovered that "a whole bunch of nonsense" and misinformation had been posted on HanaHaus's Google Places account. Defendant had also posted that HanaHaus was going to be converted into an SAP office, which was inconsistent with the city's approval of HanaHaus. Defendant had changed the passwords to the social media accounts and not given them to anyone else. It proved very difficult to recover control of those accounts.

*The Residential Fire on January 9, 2016*

On the morning of Saturday, January 9, 2016, S.S and his wife, Y.S., awoke to a beeping sound in their Palo Alto home where they lived with their daughter, who was a high school senior. The noise was coming from a fire alarm and smoke detector in their garage. Y.S. realized that their garage was full of smoke and she screamed, "Fire. Call 9-1-1." The concrete appeared to be on fire. She saw that the wooden corner of the garage was on fire and that flames were shooting up. Multiple fires were burning. 911 was called.

Y.S. was terrified. She thought her cars, which had full tanks of gas and were parked in the garage, were going to blow up. Their daughter was asleep in the house, and teenagers are hard to wake up. Y.S. smelled burning wood and gasoline. Y.S. was screaming to wake up their daughter.

S.S. came running out, and they began trying to put out the fires using garden hoses. S.S. smelled gasoline and thought that a rag or piece of towel was soaked with gasoline. Pieces of towel or rags, some in containers, had been placed under the garage door, and they kept burning. Gasoline that was puddled along the length of the garage door kept burning.

S.S. and Y.S. finally managed to put out the fires. The police and firefighters responded. Y.S. realized that her hand was burned. She believed that had happened when she unhooked the red hot, metal clasp that held the two sliding, single-car garage doors in place.

6

Shortly after the fire was out, S.S. realized that the fire had been intentional. S.S. did not have enemies or neighbors with whom he did not get along. He could think of only one person who would set fire to his house while his family and he were sleeping, and that person was defendant. Approximately five to 10 minutes after the fire had been put out, S.S. reached the conclusion that defendant was the perpetrator.

*The Investigation*

Shane Lopes, a fire investigator and a fire inspector for the City of Palo Alto Fire Department, testified as an expert. On January 9, 2016, Fire Inspector Lopes was the on-call arson investigator, and he was called out and asked to determine whether arson had occurred at the residence.

On January 9, 2016, Dujan Green, a detective with the investigative services division of the Palo Alto Police Department, collected pieces of blue singed cloth, singed headwear with a "TOP headwear" label, and a rubber gasket. At the crime scene, Detective Green smelled an odor "resembl[ing] gasoline." He took swabs of possible accelerant for testing.

William Whitaker, a City of Sunnyvale police officer, was certified as both a police officer and a firefighter. He was a "K9 handler" of Kodiak, "a police service dog," which was certified in detecting accelerants, including gasoline. Officer Whitaker responded to the scene and was asked to perform an accelerant search. There were four burnt areas along the garage, and Kodiak alerted in three of the locations.

Fire Inspector Lopes determined that someone had intentionally set the fire. There were multiple start points, and the burn patterns suggested sequential ignition. The arson originated on the residence's exterior, specifically the corner of the garage near a sliding garage door. There were remnants of "shop rags or dish towels" on the driveway. He smelled gasoline. "Gasoline is an extremely volatile, flammable liquid."

A neighbor on S.S.'s street had a "Nest Cam," which continuously sent time-and-date-stamped video recordings to Google Cloud. Upon request, the neighbor provided

recordings from the early morning hours of January 9, 2016 to the Palo Alto Police Department.  In one recording, a vehicle could be seen leaving at 6:18 a.m. and the Fire Department could be seen arriving at 6:23 a.m.

Sergeant Anthony Becker, an officer with the Palo Alto Police Department, saw the home security video showing a vehicle, believed to be a Cadillac ATS, driving to and away from the crime scene.  The sergeant learned that defendant had been identified as a person of interest, and he began trying to determine whether defendant owned or had rented a vehicle.

Christopher Moore, a City of Palo Alto police officer, was involved in the arson investigation on January 9, 2016, and he was tasked with searching the area for a dark-colored sedan.  His vehicle's mounted camera recorded as he drove.  A photograph of a vehicle that he passed at approximately 8:30 a.m. that morning was later extracted.

In reviewing Officer Moore's video, Sergeant Becker saw a dark (either black or dark gray) Cadillac ATS parked along the curb, adjacent to defendant's address.  The sergeant could see the vehicle's license plate, and he was able to track the vehicle to Zipcar.  Zipcar rental records obtained by search warrant showed defendant had rented a Cadillac ATS with that license plate.  It would have taken 10 to 15 minutes, depending upon the route, to drive from defendant's address to the victims' address at about 6:00 a.m. on a Saturday morning.

Detective Eric Bulatao, an officer with the City of Palo Alto Police Department, also investigated the January 9, 2016 arson.  The police obtained defendant's phone number from S.S. and then contacted the carrier.  The police obtained the past 24 hours of defendant's phone records and determined that the last phone call had been made to Zipcar.

Agent Anajanette Holler, a police officer with the Palo Alto Police Department, was part of a team that executed a search warrant of defendant's home, a small studio apartment, at approximately 10:00 a.m. on January 10, 2016.  She was looking for

8

evidence of arson. Officer Whitaker and Kodiak participated in the search of defendant's home. Kodiak alerted on the shoe and sock found together on the ground inside the front doorway. Kodiak showed particular interest, but did not alert, in the bathroom by the floor mat, in between the toilet and the bathtub or shower area.

The police collected items from the inside of defendant's residence, including defendant's gray New Balance shoes and a single black sock to which the dog had alerted, a Zipcard with a member number on it, packaging for "a heat-resistant mitt," and a Whole Foods receipt dated January 6, 2016. The receipt showed that defendant had purchased an organic Kombucha drink. A "white plastic mask" was found inside "the built-in shelf cabinets" near the bed. A red and white article of clothing was found in defendant's closet. A black backpack, which was next to the shower in defendant's bathroom, was collected.

During the search of defendant's outside storage shed, the police found an open cardboard box containing a gas can, a heat-resistant glove, and the package for the glove. The box also contained Amazon packaging. The gas can smelled like gasoline. During the two-hour-and-15-minute search of defendant's apartment, Agent Holler did not see anything that required gasoline. Kodiak alerted on the box containing the gas can with liquid inside. After a heat-protective glove stored in the box was separated from the gas can, Kodiak separately alerted on the glove.

Defendant's storage shed also contained a plastic seal from a bottle cap, which stated something along the lines of, "Contains alcohol. Must be 21 years or older." The plastic seal was "consistent [with], if not identical [to], . . . a bottle of Kombucha that was in the middle of the defendant's [home]."

Detective Bulatao prepared a search warrant for Amazon records of defendant's purchases for a specified period, and Amazon provided a purchase history. Defendant had purchased the heat-resistant glove or barbecue mitt from Amazon and a beige, Top Headwear ski mask at 4:22 a.m. Pacific Standard Time on January 6, 2016. Both

9

items had been delivered to defendant on January 8, 2016. The heat-resistant glove that defendant had purchased matched the glove found in the box in his storage shed. The ski mask that defendant had purchased matched the one found on the driveway of the victims' home.

On January 10, 2016, the police took the Cadillac ATS into evidence after finding it parked outside in a parking lot that had parking spots for Zipcar vehicles. The vehicle was locked but its windows were rolled down about two inches. Gasoline dissipates or "volatize[s] out" when exposed to air. The head of Zipcar security confirmed that no one had rented the vehicle after defendant had turned it in.

The Zipcar security manager at the time of trial testified regarding Zipcar's rental records for a 2015 Cadillac ATS with license plate 7GNV470. He explained that a Zipcar member may rent a vehicle online and then use his or her Zipcard to get into the vehicle. Each Zipcar vehicle had a Zipcar decal, and its keys were inside. Each vehicle was equipped with a GPS device, and the GPS tracking system was always on. But Zipcar did not keep a history of GPS location information.

The rental records for the Cadillac showed that at 9:14 p.m. on January 7, 2016, the Zipcar member who was renting the Cadillac asked whether Zipcar was able to "GPS the vehicle." A Zipcar representative responded that Zipcar was not able to provide GPS information for privacy reasons. Defendant had rented the Cadillac, beginning at 9:00 a.m. on January 8, 2016 and ending at 2:00 p.m. on January 9, 2016. The records further disclosed that at 5:05:13 a.m. on January 9, 2016, the vehicle's door was open. At 6:03:10 a.m. on January 9, 2016, the Cadillac's doors were unlocked and its ignition was on, and at 6:32:52 a.m. on January 9, 2016, the engine was off. The engine was on again at 11:09:30 a.m. on January 9, 2016, and its door was open at 11:25:26 a.m. on January 9, 2016.

On January 12, 2016, Officer Whitaker took his dog Kodiak to search a Cadillac ATS in Palo Alto Police Department's secured facility. Although Kodiak did not alert,

Kodiak displayed interest and engaged in intense sniffing at the base of the back seat at its crease. A property analyst technician with the Palo Alto Police Department processed the Cadillac. She took photographs of the vehicle's exterior and interior, swabbed it for "contact DNA," and collected a portion of the back seat to which Kodiak had responded. Defendant's driver's license was found underneath the front passenger seat.

A crime analyst with the Santa Clara County Crime Laboratory testified as an expert in the analysis of ignitable liquids, which include gasoline. She confirmed that the liquid inside of the gas can was gasoline. She tested the People's exhibits 23, 24, and 25 (pieces of cloth collected from the crime scene) and confirmed that gasoline was present in each of them. She tested the heat-resistant glove and found gasoline.

B. *Defense Case*

Detective Bulatao was also called as a witness by the defense. He testified that the warrant to search defendant's residence was executed at 9:45 a.m. on January 10, 2016. Defendant was asked to exit his home, and he used crutches to walk out and to get around that day. He was wearing a medical boot on one of his legs.

Detective Bulatao had reason to believe, however, that defendant was being untruthful about his physical abilities. The police had found a Best Buy store receipt with a time and date stamp of 8:45 p.m. on January 8, 2016 in defendant's home. Detective Bulatao obtained and reviewed surveillance video from that Best Buy store location. He saw defendant, who had "a walking cast boot" on one foot, walking by himself into the store carrying a large box. He knew that Detective Joel Hornung had conducted surveillance of defendant's home and observed defendant "walking on his own . . . after being dropped off by an Uber."

Detective Bulatao confirmed that the ski cap was initially analyzed by the crime lab for only the presence of accelerants, not DNA. When the crime lab was later asked to perform DNA and hair sample analyses on the cap, the lab found nothing tying defendant to it.

11

Detective Bulatao acknowledged that the video clips obtained from the neighbor's Nest Cam showed that a dark SUV drove past in the direction of the victims' house at 5:23 a.m. on the morning of the fire. The detective confirmed that the street was not a dead end and that a vehicle did not need to drive past the neighbor's house to leave the street.

Detective Bulatao acknowledged that no burn marks were found on defendant.

C. *The Prosecution's Rebuttal*

As part of the initial arson investigation, Detective Hornung, an officer with the Palo Alto Police Department, conducted surveillance of the residence believed to have been involved in the arson. Officer Hornung arrived at 11:45 a.m. and was there until approximately 4:00 p.m. He watched from the back seat of an unmarked vehicle. The detective saw defendant arrive at the residence at approximately 1:45 or 2:00 p.m. in what appeared to be an Uber vehicle. The officer captured on video defendant walking unassisted into his residence, including his navigation of a staircase and his grabbing of some bags from somebody walking with him. Although defendant had a "device" on one foot, he was not using crutches or a wheelchair. The video was played for the jury.

II

*Discussion*

A. *Motion to Suppress*

1. *Background*

Defendant moved to traverse the search warrant and suppress evidence pursuant to section 1538.5 on the ground that the underlying affidavit did not establish the probable cause required for a search warrant.

In his search warrant affidavit, Detective Bulatao stated the following. At 6:19 a.m. on January 9, 2016, the Palo Alto Fire Department responded to a fire at a Palo Alto address. Police also responded to the scene. There was "a strong odor similar to gasoline" coming from the driveway area. The Fire Department suspected that the fire

12

was intentional and informed responding police officers that it appeared that an accelerant had been used to set the garage door on fire. S.S. had said that "several small blue bath towels and a brown watch cap located on the driveway . . . did not belong to him." The police "established a secured crime scene."

At approximately 11:00 a.m. on January 9, 2016, Officer Whitaker of the Sunnyvale Department of Public Safety and his "nationally certified accelerant detection dog," Kodiak, arrived at the scene. Officer Whitaker informed Detective Bulatao that "Kodiak [had] indicated the presence of accelerant on three different locations at the garage door." Based on this information, Detective Bulatao believed that the residence had been "specifically targeted" and that "an unknown suspect [had] intentionally set fire to" it.

S.S. told Detective Bulatao that he was a vice president of SAP and managed a Palo Alto coffee shop catering to the technology industry. S.S. had supervised defendant for the past year. In March 2015, defendant was "having performance problems." Defendant had taken "an extended leave of absence." Defendant was "displeased" with his supervisor, S.S.

In November of 2015, defendant "showed up at work when he was not supposed to be there because he was still on leave," and S.S. escorted defendant out. In late November of 2015, an alarm at the coffee shop was triggered, and the video showed that a "masked subject [had] used a key to enter the business but [had] not enter[ed] the proper key code . . . ." The subject had "released several cockroaches into the building." The health department received "an anonymous call" "describing the cockroaches." S.S. identified the person in the video recording as defendant. Defendant was terminated.

"A few weeks later an unknown person posted a Craigslist advertisement for an apartment in San Francisco at a rate that [was] well below market rent," and it listed S.S.'s personal cell phone number as the contact for the rental, which "resulted in a barrage of phone calls" and caused S.S. to change his phone number. S.S. believed

13

defendant was responsible for the advertisement because of its timing after defendant's termination and defendant's knowledge of his personal cell phone number.

"A week later, an unknown subject appeared to have driven a vehicle through the glass entrance" of the coffee shop, causing damage costing approximately $125,000. S.S. "suspected [defendant was] responsible given the timing of the incident in relation to the prior incidents and [defendant's] termination."

The affiant obtained pertinent correspondence from SAP's human resources department. Defendant had made complaints against S.S. and expressed "his displeasure over his termination." S.S. had sent an email to the company's management, stating "his concern for his personal safety and the safety of his employees" due to defendant's prior acts.

On December 16, 2015, Palo Alto police were dispatched to conduct a welfare check of defendant after a Kaiser Hospital employee called police and reported that defendant had written "an email that consisted of veiled suicidal threats." The employee reported that defendant's email statements "indicated [that] he was hostile with violent tendencies." Upon contacting defendant, the police determined that defendant was "not a danger to himself at that time."

On December 22, 2015 and on December 25, 2015, defendant called police and stated that "he believed someone was outside of his house." In both instances, the police responded and determined that no one was there. "[R]esponding officers suspected that [defendant] was out of touch with reality and might be suffering from mental health issues."

S.S. had told Detective Bulatao that defendant previously had been to S.S.'s home and was "well aware [of] where [S.S.] lived." Defendant was also aware that S.S.'s residence had no alarm or security cameras "because they had discussed this previously."

S.S. told Detective Bulatao that he had spoken with several other SAP employees who had worked with defendant, including another former supervisor, and they had

14

"disclosed [their] concern over [defendant's] erratic and unpredictable behavior." S.S. had also seen defendant display erratic behavior. He reported that defendant had "purposely altered their company's social networking pages (Facebook, Instagram, Twitter) and posted information that was not true." Defendant had "changed the location of the downtown business with Google maps." Defendant had also "listed the downtown location as an office space which was not true and violated an agreement with the Architect Review Board."

Defendant had been arrested for assault with a deadly weapon in Los Gatos, California, in 2013.

Detective Bulatao indicated that based on his training and/or experience it was probable that defendant committed the crime of arson, a violation of section 451, subdivision (b). He based his conclusion on (1) "the specificity of the location of the arson" in a residential area "where few people would have any reason to go" without "a specific connection to [the] houses on that street;" (2) defendant's recent termination from SAP and his stated displeasure with S.S.; (3) the cockroach incident (as to which S.S. had identified defendant as the culprit); (4) the incident of the Craigslist ad (in which the below-market ad listed S.S.'s private cell phone number); and (5) defendant's erratic behavior reported by Kaiser and observed by police.

Based on his experience that people often keep receipts from recent purchases, Detective Bulatao stated his belief that receipts from purchases of "items pertaining to [the] investigation (i.e. gas purchases, towels, canisters)" would be found in defendant's residence. He also stated, based on his training and experience, that he knew that fire accelerant is "contained in canisters or other containers," that "persons who use accelerants to soak rags, such as the blue towels in this case, may do so in the safety of their homes to avoid detection," that "those canisters or other containers of accelerant may be found if a search is conducted," and that "when a specific item is used in a crime—in this case, blue towels cut into rags"—"often more of the same type of items

15

will be found in a person's home." The detective believed that "a certified canine" would provide "great assistance in locating the presence of accelerant." The detective also knew, based on his training and/or experience, that "liquids [such] as a fire accelerant can often spill onto a person's clothes," that "dogs trained in accelerant detection can alert to the presence or non-presence of an accelerant," and that "personal items of clothing will be found in a person's residence."

Detective Bulatao also believed, based on his training and experience, that it was "probable that the evidence associated with the crime scene may be able to be analyzed forensically for fingerprints and/or DNA and that a comparison with [defendant's] fingerprints and/or DNA would help identify the perpetrator of the crime." To preserve any evidence of Internet searches related to the arson, phone calls received or made, and information as to the phone's location, the detective requested that "any devices that appear capable of an [I]nternet connection and specifically any cellular telephone or computer be seized so that a search warrant that complies with the requirements of the Electronic Communications Privacy Act can be obtained."

The court denied defendant's motion to traverse the search warrants and suppress evidence.

2. *Validity of the Search Warrant*

a. *Governing Law*

"The Fourth Amendment to the United States Constitution prohibits 'unreasonable searches and seizures' and requires search warrants to be issued only upon a showing of 'probable cause' describing with particularity 'the place to be searched, and the . . . things to be seized.' (U.S. Const., 4th Amend.)" (*People v. Westerfield* (2019) 6 Cal.5th 632, 659 (*Westerfield*).) "[P]robable cause does not demand the certainty we associate with formal trials." (*Illinois v. Gates* (1983) 462 U.S. 213, 246 (*Gates*).)

"The showing required in order to establish probable cause is less than a preponderance of the evidence or even a prima facie case. (*Illinois v. Gates*, *supra*, 462

16

U.S. at p. 235.)" (*People v. Carrington* (2009) 47 Cal.4th 145, 163.) "The pertinent rules governing a Fourth Amendment challenge to the validity of a search warrant, and the search conducted pursuant to it, are well-settled. 'The question facing a reviewing court asked to determine whether probable cause supported the issuance of the warrant is whether the magistrate had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing.' (*People v. Kraft* (2000) 23 Cal.4th 978, 1040 (*Kraft*), citing *Illinois v. Gates* (1983) 462 U.S. 213, 238-239.)" (*Westerfield*, *supra*, 6 Cal.5th at p. 659.) "[P]robable cause [to believe an offense has been committed] requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. By hypothesis, therefore, innocent behavior frequently will provide the basis for a showing of probable cause . . . ." (*Gates*, *supra*, at p. 244, fn. 13.)

"The test for probable cause is not reducible to 'precise definition or quantification.' [Citation.] 'Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence . . . have no place in the [probable-cause] decision.' [Citation.] All [the United States Supreme Court has] required is the kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act.' [Citation.]" (*Florida v. Harris* (2013) 568 U.S. 237, 243-244 (*Harris*).) "In evaluating whether the State has met this practical and common-sensical standard [of probable cause], [the United States Supreme Court has] consistently looked to the totality of the circumstances. [Citations.] [The court has] rejected rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach. . . . Probable cause . . . is 'a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.' [Citation.]" (*Harris*, *supra*, 568 U.S. at p. 244.)

"The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay

information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." (*Gates*, *supra*, 462 U.S. at p. 238.) But "[s]ufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." (*Id.* at p. 239.) "An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause . . . ." (*Ibid.*) Wholly conclusory statements do not suffice to meet that requirement. (*Ibid.*)

A reviewing court does not conduct a de novo review of the sufficiency of a search warrant affidavit but rather determines whether there is substantial evidence supporting the magistrate's decision to issue the warrant. (See *Gates*, *supra*, 462 U.S. at pp. 236-237.) "Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and [the United States Supreme Court has] thus concluded that the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination. [Citations.]" (*Unites States v. Leon* (1984) 468 U.S. 897, 914 (*Leon*).) "[T]he warrant 'can be upset only if the affidavit fails as a matter of law to set forth sufficient competent evidence' supporting the finding of probable cause." (*Westerfield*, *supra*, 6 Cal.5th at p. 660.)

b. *Analysis*

Defendant argues that the search warrant "affidavit included no facts discovered at the scene of the crime that logically pointed to [him] as the perpetrator, i.e. none of the evidence found at the scene connected [him] to the arson." He contends that evidence of suspicious acts or other crimes unrelated to the arson under investigation cannot establish probable cause to search for evidence of the arson. Defendant asserts that "the affiant's core conclusion supporting the warrant—i.e.[,] that [he] probably committed the arson— was not supported by a factual foundation."

Defendant argues that "[n]early every fact [proven at trial] that connected [him] to the arson itself was discovered through the [execution of the search] warrant, or

18

discovered based on evidence found through the warrant." He maintains that such evidence should have been suppressed, that the trial court's error in failing to grant his motion to suppress was not harmless beyond a reasonable doubt, and that this court must reverse the judgment.

The affidavit set forth ample facts establishing probable cause to believe that the residence where S.S. and his family lived had been the object of arson using an accelerant. There were circumstances that implicated defendant. Defendant was disgruntled with S.S., his former supervisor. He had been having workplace performance problems that had led to an extended leave from work. S.S. had escorted him from the premises when defendant showed up at the coffee shop while he was on leave. In late November of 2015, defendant had surreptitiously entered the workplace after hours, setting off a security alarm, and he had released cockroaches into the building. The health department received an anonymous call describing the cockroaches. Shortly after the incident, defendant was terminated.

The affidavit clearly showed that after the cockroach incident and prior to the arson, both the coffee shop (defendant's former workplace) and S.S. (his former supervisor) had been injured. The Craigslist incident resulting in a barrage of phone calls on the supervisor's personal phone number, which was known to defendant, and the costly damage to the coffee shop occurred within weeks of defendant's termination. The arson of S.S.'s home occurred in early January 2016. It is true that at the time he wrote the affidavit, Detective Bulatao did not have specific information that directly tied defendant to the Craigslist incident, the damage to the coffee shop, or the arson. Nevertheless, those multiple incidents, which occurred not long after defendant's termination, together suggested that the coffee shop and S.S. were being specifically targeted for harm.

Viewing the totality of circumstances through the lens of common sense, "the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed"

19

(*Gates*, *supra*, 462 U.S. at pp. 238-239) to believe arson that arson had been committed against S.S.'s home using an accelerant, defendant was implicated, and evidence of the arson would be found in defendant's home. Consequently, the trial court properly denied the defendant's motion to suppress.

Citing two federal Court of Appeals cases, defendant nevertheless argues that evidence of crimes and suspicious acts not related to the arson cannot establish probable cause to search for evidence of arson. In one case, *United States v. Weber* (9th Cir. 1990) 923 F.2d 1338 (*Weber*), the affidavit in support of a warrant to search the defendant's house provided a general description of "the proclivities of pedophiles" (*id*. at p. 1341) and "information about different types of perverts who commit sex crimes against children" (*id*. at p. 1345), but the affidavit contained no information that placed the defendant in the category of pedophiles, child molesters, or child pornography collectors. (*Id*. at pp. 1345-1346.) The affiant did not even opine that the defendant "probably [was] a 'child molester,' 'pedophile,' or 'collector of [child] pornography' based on what he [knew] of [the defendant]." (*Id*. at p. 1341.)

In *Weber*, the United States Court of Appeals, Ninth Circuit, held that the affidavit did not establish probable cause to search for child pornography (in addition to the specific materials that had arrived at his house through a controlled delivery) because there was no evidence that the defendant had other child pornography in his home or that he was a child molester or a collector of child pornography. (*Weber*, *supra*, 923 F.2d at pp. 1345-1346.) The court stated that "if the government presents expert opinion about the behavior of a particular class of persons, for the opinion to have any relevance, the affidavit must lay a foundation which shows that the person subject to the search is a member of the class." (*Id*. at p. 1345.) The court also concluded that it could not be inferred that the defendant kept child pornography in his home from the circumstance that two years earlier a customs inspector had intercepted advertising material ("'apparently' child pornography") that had been sent to the defendant because there was

20

no proof that the defendant had requested the material and the defendant had not claimed the material after he was advised that United States Customs had it. (*Id*. at p. 1344.) In the present case, defendant argues that "[j]ust as in *Weber*, the affidavit[']s account of suspicious events and allegations [of] prior bad conduct were insufficient to support the magistrate[']s finding of probable cause."

In *United States v. Underwood* (9th Cir. 2013) 725 F.3d 1076, another case cited by defendant, defendant Underwood challenged a warrant to search for evidence of drug trafficking in his home. The United States Court of Appeals, Ninth Circuit, determined that the affidavit "fail[ed] to provide a sufficient basis for probable cause" because "[l]ike the affidavit in *Weber*, [it] include[d] only two facts, foundationless expert opinion [about the general behavior of drug traffickers], and conclusory allegations." (*Id*. at p. 1082.) The court concluded that a detective's observation of a baggie of marijuana of an amount consistent with personal use at Underwood's home "lack[ed] a nexus with ecstasy trafficking and therefore [did] not support the conclusion that Underwood [was an] ecstasy trafficker." (*Ibid*.) The court also concluded that agents' observation of defendant Underwood's delivery of two unmarked wooden crates could not support a conclusion that he was a drug courier. (*Id*. at pp. 1083-1084.) In this case, defendant contends that "*Underwood* teaches that even if an affidavit points to suspicious behavior or prior potentially-criminal [*sic*] acts, this sort of evidence cannot support a finding of probable cause."

In this case, unlike *Weber* or *Underwood*, the search warrant affiant did not rely on expert opinion concerning the general behavior of arsonists as a group and offer an unfounded conclusion that defendant was an arsonist. Rather, the affidavit set forth evidence of defendant's extended leave from work due to workplace performance problems; his termination of employment after he surreptitiously released cockroaches into his workplace; defendant's disgruntled attitude toward his termination and his former supervisor, which provided a possible motive of retaliation against his workplace and his

21

former supervisor; the multiple harmful actions targeting defendant's former workplace and his former supervisor shortly after defendant was terminated; and defendant's apparent mental health problems. A totality-of-the-circumstances analysis supported the issuance of the warrant.

Even if a close question, we conclude that the issuing magistrate had a substantial basis for concluding that probable cause existed for issuance of the search warrant, i.e., there was a fair probability that evidence of the crime would be found in defendant's home. (See *Gates*, *supra*, 462 U.S. at pp. 238-239; see also *Unites States v. Jackson* (9th Cir. 1985) 756 F.2d 703, 705 [direct evidence linking evidence to search site not required]; cf. *United States v. Aljabari* (7th Cir. 2010) 626 F.3d 940, 945 [Where affidavit provided reason to believe that the defendant had participated in the crime of arson, "[s]imple common sense supports the inference that one likely place to find evidence of a crime is the suspect's home, at least absent any information indicating to the contrary. [Citations.]"].)

3. *Good Faith Exception to the Exclusionary Rule*

Even if we concluded that the search warrant was not valid, the good faith exception to the exclusionary rule would apply, as the prosecution argued below. "Whether the exclusionary sanction is appropriately imposed in a particular case . . . is 'an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.' [Citation.]" (*Leon*, *supra*, 468 U.S. at p. 906.)

Defendant argued below, as he does on appeal, that the good-faith exception was inapplicable because the affidavit was "bare bones" because it recited S.S.'s suspicions, beliefs, or conclusions about defendant without independent, supporting information. He contends that S.S. "gave no facts identifying [him] as the person who placed the false Craigslist ad" or linking him to the other post-termination incidents and that S.S.'s suspicion that he was the perpetrator of the arson was "unverified." He asserts that "[a]

22

reasonable, well-trained officer would have concluded that there were no specific facts linking [him] to [the] arson or any of the incidents detailed in the affidavit."

In *Leon*, the United States Supreme Court recognized a good faith exception to the exclusionary rule where police conduct a search in "objectively reasonable reliance" on a warrant later held invalid. (*Leon*, *supra*, 468 U.S. at p. 922; see *id.* at p. 924 [the good-faith exception turns on objective reasonableness].) The court explained: "It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." (*Id.* at p. 921.)

Nevertheless, the Supreme Court identified certain situations where the good faith exception would not apply. For example, an officer would not "manifest objective good faith in relying on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.' [Citations.]" (*Leon*, *supra*, 468 U.S. at p. 923.) The court also stated that "a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid. [Citation.]" (*Ibid.*)

Contrary to defendant's assertion, Detective Bulatao's affidavit was not "bare bones." It provided information that had been gathered through investigation of the fire and had led the detective to believe that arson, using an accelerant, of S.S.'s residence had occurred. It contained information obtained from S.S., who was defendant's former supervisor, concerning defendant's deficient work performance, defendant's termination after the cockroach incident, and the circumstances and the timing of other post-termination incidents against defendant's former workplace and S.S. in addition to the arson. (See *Humphrey v. Appellate Division* (2002) 29 Cal.4th 569, 574 ["Personal

knowledge of facts asserted in the affidavit is not an indispensable element of probable cause."], 575-576 [a crime victim is presumptively reliable].)  His affidavit also included information that the detective had obtained from the company's human resources department, namely that defendant had made complaints against S.S. and was displeased by his termination.  The affidavit was not so deficient that a well-trained officer could not have reasonably believed that probable cause existed and could not have reasonably relied on the issued warrant.  (See *Leon*, *supra*, 468 U.S. at p. 923.)  It reflected a serious investigation and presented at least a close question as to probable cause, about which reasonable minds might differ.  "Under these circumstances, the officers' reliance on the magistrate's determination of probable cause was objectively reasonable, and application of the extreme sanction of exclusion is inappropriate."  (*Id*. at p. 926.)

B.  *Pretrial Diversion Under Section 1001.36*

Defendant asserts that under *Estrada*'s presumptive inference of retroactivity, as applied in *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299 (*Lara*), this case must be remanded so that the trial court can exercise its discretion under section 1001.36.  This fairly recent law permits courts to order pretrial diversion for mental health treatment for certain defendants with mental disorders.  Section 1001.36 was not in effect when defendant committed arson of an inhabited structure in 2016, when the jury found him guilty in 2017, or when he was sentenced and filed his notice of appeal in February 2018.

Section 1001.36 was added by statute, effective June 27, 2018.  (Stats. 2018, ch. 34, §§ 24, 37, pp. 1316-1319, 1339.)  The section was amended by statute later in 2018, effective January 1, 2019.  (Stats.2018, ch. 1005, § 1, pp. 6632-6634.)  It now provides in part that "the court may, after considering the positions of the defense and prosecution, grant pretrial diversion to a defendant pursuant to this section if the defendant meets all of the requirements specified."  (§ 1001.36, subd. (a).)

To grant pretrial diversion for mental health treatment, the court must be "satisfied that the defendant suffers from a mental disorder as identified in the most recent edition

24

of the Diagnostic and Statistical Manual of Mental Disorders"[2] (§ 1001.36, subd. (b)(1)(A)), that "the defendant's mental disorder was a significant factor in the commission of the charged offense" (§ 1001.36, subd. (b)(1)(B)), and that "the defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community."[3] (§ 1001.36, subd. (b)(1)(F).) It must be shown that "[i]n the opinion of a qualified mental health expert, the defendant's symptoms of the mental disorder motivating the criminal behavior would respond to mental health treatment." (§ 1001.36, subd. (b)(1)(C).) The defendant must consent to diversion (§ 1001.36, subd. (b)(1)(D)); waive the "right to a speedy trial, unless a defendant has been found to be an appropriate candidate for diversion in lieu of commitment [as a mentally incompetent defendant] and, as a result of his or her mental incompetence, cannot consent to diversion or give a knowing and intelligent waiver of his or her right to

---

[2] An exception applies to those persons suffering from "antisocial personality disorder, borderline personality disorder, and pedophilia," and they are not eligible for pretrial diversion for mental health treatment. (§ 1001.36, subd. (b)(1)(A).)

[3] Section 1170.18, subdivision (c), defines the phrase "unreasonable risk of danger to public safety" to mean "an unreasonable risk that the petitioner will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of [s]ection 667." Section 667, subdivision (e)(2)(iv), states: "The defendant suffered a prior serious or violent felony conviction . . . for any of the following felonies: [¶] (I) A 'sexually violent offense' as defined in subdivision (b) of [s]ection 6600 of the Welfare and Institutions Code. [¶] (II) Oral copulation with a child who is under 14 years of age, and who is more than 10 years younger than he or she as defined by [s]ection 288a, sodomy with another person who is under 14 years of age and more than 10 years younger than he or she as defined by [s]ection 286, or sexual penetration with another person who is under 14 years of age, and who is more than 10 years younger than he or she, as defined by [s]ection 289. [¶] (III) A lewd or lascivious act involving a child under 14 years of age, in violation of [s]ection 288. [¶] (IV) Any homicide offense, including any attempted homicide offense, defined in [s]ections 187 to 191.5, inclusive. [¶] (V) Solicitation to commit murder as defined in [s]ection 653f. [¶] (VI) Assault with a machine gun on a peace officer or firefighter, as defined in paragraph (3) of subdivision (d) of [s]ection 245. [¶] (VII) Possession of a weapon of mass destruction, as defined in paragraph (1) of subdivision (a) of [s]ection 11418. [¶] (VIII) Any serious or violent felony offense punishable in California by life imprisonment or death."

a speedy trial" (*ibid.*); and agree "to comply with treatment as a condition of diversion." (§ 1001.36, subd. (b)(1)(E).) Certain crimes, not including arson, are excluded from the benefit of section 1001.36. (§ 1001.36, subd. (b)(2).)

A defendant who performs satisfactorily in diversion and completes diversion is entitled to have the trial court "dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion."[4] (§ 1001.36, subd. (e).) "A court may conclude that the defendant has performed satisfactorily if the defendant has substantially complied with the requirements of diversion, has avoided significant new violations of law unrelated to the defendant's mental health condition, and has a plan in place for long-term mental health care." (*Ibid.*) Except as specified, "[u]pon successful completion of diversion, if the court dismisses the charges, the arrest upon which the diversion was based shall be deemed never to have occurred, and the court shall order access to the record of the arrest restricted in accordance with [s]ection 1001.9 . . . ." (*Ibid.*) Except as specified, "[t]he defendant who successfully completes diversion may indicate in response to any question concerning his or her prior criminal record that he or she was not arrested or diverted for the offense . . . ." (*Ibid.*)

After the jury's verdict in this case, the trial court ordered defendant to submit to a psychiatric or psychological examination for the purpose of sentencing (§ 457). Pointing mainly to the evaluating psychologist's report prepared in December of 2017, defendant maintains that he qualifies for diversion under section 1001.36.

The psychological evaluator's report indicated that over the three to six months prior to his commission of arson, defendant "clearly developed a significant psychiatric

---

[4] In a number of specified circumstances, the trial court must "hold a hearing to determine whether the criminal proceedings should be reinstated, whether the treatment should be modified, or whether the defendant should be conserved and referred to the conservatorship investigator of the county of commitment to initiate conservatorship proceedings." (§ 1001.36, subd. (d); see Welf. & Inst. Code, § 5350 et seq. [conservatorship for gravely disabled persons].)

illness (major depressive disorder)" and he "clearly experienced suicidal ideation on one or more occasions prior to the offense." Defendant reported having severe stress related to work and a very stressful relationship with his former supervisor. He had not worked since approximately June of 2015. Defendant had a history of depression and received extensive psychiatric treatment from June of 2015 until January 9, 2016, the date of the offense.

The evaluation indicated that on one or more occasions in late 2015, defendant received emergency room treatment for panic attacks. Defendant had a psychiatric hospitalization from January 1, 2016 to January 6, 2016. On January 8, 2016, defendant had an unsuccessful job interview and then received medical advice that his foot pain was likely to be chronic. The evaluator characterized those events as stressors immediately preceding the offense. Defendant had described experiencing significant despondency and anger on the evening of January 8, 2016 and drinking alcohol and consuming cannabis over the course of that evening. At that point in time, defendant had prescriptions for multiple medications.

In *People v. Frahs* (2018) 27 Cal.App.5th 784 (*Frahs*) (review granted on December 27, 2018, S252220), the defendant argued that section 1001.36 should retroactively apply to him. (*Frahs*, *supra*, at p. 787.) The section had been enacted while the defendant's appeal was pending. (*Ibid*.) The Court of Appeal, Fourth District, Division 3, conditionally reversed the judgment and remanded the matter to the trial court to determine defendant's eligibility for diversion under former section 1001.36. (*Frahs*, *supra*, at pp. 792, 796.)

The *Frahs* court cited *Lara* in concluding that former section 1001.36 operated retroactively as to the case pending before it, a nonfinal judgment. (See *Frahs*, *supra*, 27 Cal.App.5th at pp. 790-792.) *Lara* held that "Proposition 57's juvenile law provisions [regarding juvenile transfer hearings] apply retroactively to cases filed in adult court before it took effect." (*Lara*, *supra*, 4 Cal.5th at p. 305, fn. omitted.) The Supreme Court

observed in *Lara*, "Proposition 57 prohibits prosecutors from charging juveniles with crimes directly in adult court. Instead, they must commence the action in juvenile court. If the prosecution wishes to try the juvenile as an adult, the juvenile court must conduct . . . a 'transfer hearing' to determine whether the matter should remain in juvenile court or be transferred to adult court. Only if the juvenile court transfers the matter to adult court can the juvenile be tried and sentenced as an adult. (See Welf. & Inst. Code, § 707, subd. (a).)" (*Id*. at p. 303, fn. omitted.)

In *Lara*, the Supreme Court reasoned: "The possibility of being treated as a juvenile in juvenile court—where rehabilitation is the goal—rather than being tried and sentenced as an adult can result in dramatically different and more lenient treatment. Therefore, Proposition 57 reduces the possible punishment for a class of persons, namely juveniles. For this reason, *Estrada*'s inference of retroactivity applies." (*Lara*, *supra*, 4 Cal.5th at p. 303.) It found that "nothing in Proposition 57's text or ballot materials rebuts [*Estrada*'s presumptive inference of retroactivity]." (*Id*. at pp. 303-304.) In the absence of contrary evidence, the court concluded that "Proposition 57 is an 'ameliorative change[ ] to the criminal law' that we infer the legislative body intended 'to extend as broadly as possible.' [Citation.]" (*Id*. at p. 309.)

The appellate court in *Frahs* reasoned: "[S]imilar to Proposition 57, the mental health diversion program under section 1001.36 does not lessen the punishment for a particular crime. However, for a defendant with a diagnosed mental disorder, it is unquestionably an 'ameliorating benefit' to have the opportunity for diversion—and ultimately a possible dismissal—under section 1001.36. Further, it appears that the Legislature intended the mental health diversion program to apply as broadly as possible: 'The purpose of this chapter is to promote . . . [¶] (a) *Increased diversion* of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety.' (§ 1001.35, subd. (a), italics added.)" (*Frahs*, *supra*, 27 Cal.App.5th at p. 791.) The court in *Frahs* inferred, relying upon the

28

Supreme Court's reasoning in *Lara*, that "the Legislature 'must have intended' . . . the potential 'ameliorating benefits' of mental health diversion to 'apply to every case to which it constitutionally could apply.' (*Estrada*, *supra*, 63 Cal.2d at pp. 744-746.)" (*Ibid*.)

Because Frahs's case was "not yet final on appeal and the record affirmatively disclose[d] that he appear[ed] to meet at least one of the threshold requirements (a diagnosed mental disorder)" (*Frahs*, *supra*, 27 Cal.App.5th at p. 791), the appellate court conditionally reversed Frahs's convictions (*id*. at p. 792). The appellate court specifically directed the trial court to do the following upon remand: "If the trial court determines that Frahs qualifies for diversion under section 1001.36, then the court may grant diversion. If Frahs successfully completes diversion, then the trial court shall dismiss the charges. However, if the court determines that Frahs is ineligible for diversion, or Frahs does not successfully complete diversion, then his convictions and sentence shall be reinstated." (*Id*. at p. 796.)

In *Frahs*, the appellate court explained that "[w]hen conducting the eligibility hearing, the [trial] court shall, to the extent possible, treat the matter *as though* Frahs had moved for pretrial diversion after the charges had been filed, but prior to their adjudication. (§ 1001.36, subd. (c).)" (*Frahs*, *supra*, 27 Cal.App.5th at p. 792, italics added.) The appellate court additionally instructed: "If the trial court finds that Frahs suffers from a mental disorder, does not pose an unreasonable risk of danger to public safety, and otherwise meets the six statutory criteria (as nearly as possible given the postconviction procedural posture of this case), then the court may grant diversion." (*Ibid*.)

On its own motion, the California Supreme Court granted review in *Frahs*. The Supreme Court "limited review to the following issues: (1) Does Penal Code section 1001.36 apply retroactively to all cases in which the judgment is not yet final? (2) Did the Court of Appeal err by remanding for a determination of defendant's eligibility under

29

Penal Code section 1001.36?"

(<https://appellatecases.courtinfo.ca.gov/search/case/mainCaseScreen.cfm?dist=0&doc_i
d=2268844&doc_no=S252220&request_token=NiIwLSIkTkg%2FW1BJSCJNUENJUE
Q0UDxTJiI%2BTzhTMCAgCg%3D%3D&bck> [as of October 21, 2019], archived at
<https://perma.cc/D5X7-SU3K>.)

On appeal in this case, defendant relies on *Lara*, as did Frahs, to argue that
section 1001.36 retroactively applies to his case.  The People counter that unlike
Proposition 57, section 1001.36 contains "direct language" indicating that pretrial
diversion is available only prospectively.  They point to subdivision (c) of
section 1001.36, which defines "pretrial diversion" to mean "the postponement of
prosecution, either temporarily or permanently, at any point in the judicial process from
the point at which the accused is charged until adjudication, to allow the defendant to
undergo mental health treatment," subject to all of the specified requirements.  They
assert that *Frahs* was wrongly decided.  We agree and decline to follow *Frahs*.

"The *Estrada* rule rests on an inference that, in the absence of contrary indications,
a legislative body ordinarily intends for ameliorative changes to the criminal law to
extend as broadly as possible, distinguishing only as necessary between sentences that are
final and sentences that are not.  (See *Estrada*, *supra*, 63 Cal.2d at p. 745.)"  (*People v.
Conley* (2016) 63 Cal.4th 646, 657 (*Conley*).)  "To ascertain whether a statute should be
applied retroactively, legislative intent is the 'paramount' consideration . . . ."  (*People v.
Nasalga* (1996) 12 Cal.4th 784, 792 (*Nasalga*) (plur. opn. of Werdegar, J.).)  The
determination whether ameliorative changes to the criminal laws are retroactively applied
is "ultimately governed by the intent of the legislative body."  (*Conley*, *supra*, at p. 661.)

"The rule in *Estrada*, of course, is not implicated where the Legislature clearly
signals its intent to make the amendment prospective, by the inclusion of either an
express saving clause or its equivalent."  (*Nasalga*, *supra*, 12 Cal.4th at p. 793,
fn. omitted.)  While express statements of legislative intent "unquestionably suffice to

30

override the *Estrada* presumption, the 'absence of an express saving clause . . . does not end "[the] quest for legislative intent." ' [Citations.]" (*Conley*, *supra*, 63 Cal.4th at p. 656.) "[The California Supreme Court's] cases do not 'dictate to legislative drafters the forms in which laws must be written' to express an intent to modify or limit the retroactive effect of an ameliorative change; rather, they require 'that the Legislature demonstrate its intention with sufficient clarity that a reviewing court can discern and effectuate it.' [Citations.]" (*Id*. at pp. 656-657.) A court may consider "the text, structure, and purposes" (*id*. at p. 661) of a statute in determining legislative intent.

Unlike the amended sections in *Estrada*, the pretrial diversion law did not lessen the punishment for a particular crime. (See *Estrada*, *supra*, 63 Cal.2d at pp. 743-744.) Unlike the statute in *People v. Francis* (1969) 71 Cal.2d 66, the pretrial diversion law did not make the crime of which defendant was convicted a wobbler, which created the possibility of lesser punishment for a particular crime. (See *id*. at p. 75.) The pretrial diversion law does, however, create the possibility of no punishment for a class of certain defendants with mental disorders who may receive pretrial diversion.

As indicated, by the terms of the pretrial diversion law, "pretrial diversion" is "the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged *until adjudication*, to allow the defendant to undergo mental health treatment," subject to certain conditions. (§ 1001.36, subd. (c), italics added.) Nothing in sections 1001.35 (purposes of pretrial diversion of individuals with mental disorders) and 1001.36 suggests that the Legislature intended to retroactively reset to the pre-adjudication stage the cases of all defendants who would have been eligible for *pretrial* diversion for mental health treatment had the pretrial diversion law been in existence before their cases were adjudicated.

31

We recognize that the pretrial diversion law has salutary purposes.[5] But the remedial purpose of the law is not controlling if the Legislature did not intend the law to have full retroactive operation.

Here, the legislative history of the pretrial diversion law for mental health treatment suggests that the law was intended to save money as well as provide benefits to certain defendants with mental disorders. The passage of Assembly Bill No. 1810 (Reg. Sess. 2017-2018) in 2018 added the pretrial diversion law. The bill was an "omnibus health trailer bill" concerning a multitude of statutory changes to implement the 2018-2019 budget, including pretrial diversion for mental health treatment. (See Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1810 (2017-2018 Reg. Sess.) as amended June 12, 2018, pp. 1, 3; Assem. Floor Analysis of Assem. Bill No. 1810 (2017-2018 Reg. Sess.) as amended June 12, 2018, pp. 1, 7-10; Sen. Com. on Budget and Fiscal Review, Rep. on Assem. Bill No. 1810 (2017-2018 Reg. Sess.) as amended June 12, 2018, pp. 1-3.)

The passage of another bill later in 2018, Senate Bill No. 215 (Reg. Sess. 2017-2018), amended section 1001.36 to place some limitations on pretrial diversion for mental health treatment and provide for victim restitution. (See § 1001.36, subds. (b)(2), (b)(3), (c)(4).) The legislative analyses of this bill set forth the basic purposes of such pretrial diversion, which include (1) diverting eligible defendants into treatment at "an early stage in the proceedings" and (2) potentially securing significant local savings from avoiding trial and reducing incarceration. (See Sen. Rules Com., Office of Sen. Floor Analyses, Rep. on Sen. Bill No. 215 (2017-2018 Reg. Sess.) as amended Aug. 23, 2018,

_____

[5] Section 1001.35 states that the purpose of mental health pretrial diversion is "to promote all of the following: [¶] (a) Increased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety. [¶] (b) Allowing local discretion and flexibility for counties in the development and implementation of diversion for individuals with mental disorders across a continuum of care settings. [¶] (c) Providing diversion that meets the unique mental health treatment and support needs of individuals with mental disorders."

32

pp. 2-3; see also Assem. Sen. Third Reading of Sen. Bill No. 215 (2017-2018 Reg. Sess.) as amended Aug. 23, 2018, p. 3; Assem. Com. on Appropriations, Rep. on Sen. Bill No. 215 (2017-2018 Reg. Session) as amended June 14, 2018, p. 1.) Prior to the enactment of the pretrial diversion law, trial courts could not "order mental health treatment, relevant counselling, or adherence to a medication regime unless the person was first convicted, and then placed on probation or sent to jail at county expense." (Sen. Rules Com., Office of Sen. Floor Analyses, Rep. on Sen. Bill No. 215 (2017-2018 Reg. Sess.) as amended Aug. 23, 2018, p. 2.) According to the author, "[W]hile community based treatment for a mentally ill defendant costs roughly $20,000 per year (and greatly reduces recidivism), jailing that same defendant (with a greater risk of recidivism) costs the community more than $75,000 a year." (*Ibid*.) In contrast to the forced payment of the "higher costs for taxpayers of "continuous warehousing of the mentally ill," "early, court-assisted interventions are far more likely to lead to longer, cheaper, more stable solutions for the community, and for the person suffering from mental illness." (*Id*. at pp. 2-3.) The pretrial diversion law "seeks to . . . avoid [the] unnecessary and unproductive costs of trial and incarceration." (*Id*. at p. 3.)

Obviously, this court cannot unconditionally reverse a defendant's conviction to undo an "adjudication" where there was no trial error requiring reversal merely to allow a trial court to consider the defendant for "pretrial diversion" because that disposition would implicate the prohibition against double jeopardy.[6] (See *People v. Torres* (2019) 39 Cal.App.5th 849, 855 (*Torres*).) The double jeopardy clause of the Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment (*Benton v. Maryland* (1969) 395 U.S. 784, 794; see *People v. Fields* (1996)

---

[6] "As a general rule, it is well established that if the defendant secures on appeal a reversal of his conviction based on *trial errors* other than insufficiency of evidence, he is subject to retrial. [Citations.]" (*People v. Hernandez* (2003) 30 Cal.4th 1, 6-7, italics added; see *Price v. Georgia* (1970) 398 U.S. 323, 326 ["concept of continuing jeopardy" applies "where criminal proceedings against an accused have not run their full course"].)

13 Cal.4th 289, 297), states: "Nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb." The California Constitution similarly states: "Persons may not twice be put in jeopardy for the same offense." (Cal. Const., art. I, § 15.) In a jury trial, "jeopardy attaches when the jury is empaneled and sworn." (*Crist v. Bretz* (1978) 437 U.S. 28, 38; see *People v. Riggs* (2008) 44 Cal.4th 248, 278-279, fn. 12.) Unconditional reversal of a defendant's valid conviction merely to facilitate pretrial diversion may raise a double jeopardy bar that precludes the government from reinstating criminal proceedings where such a defendant either was ultimately found not to qualify for diversion or did not perform satisfactorily in diversion (see § 1001.36, subd. (d)). Such a result would "eviscerate[] the statute's enforcement mechanism." (*Torres*, *supra*, 39 Cal.App. 5th at p. 855.)

Even if that potential double jeopardy problems can be avoided through a conditional reversal of a defendant's judgment of conviction as has been done in Proposition 57 cases involving adult convictions, we are not convinced that the reasoning in *Lara* applies or that the statutory language of section 1001.36 structurally supports defendant's position. As indicated, *Lara* resolved that Proposition 57's juvenile transfer hearing law applies retroactively to all juveniles charged directly in adult court whose judgment was not final at the time it was enacted because nothing in the proposition's text or ballot materials rebutted *Estrada*'s inference of retroactivity. (*Lara*, *supra*, 4 Cal.5th at pp. 303-304.) It is noteworthy that in *Lara* there had been *no* trial and *no* conviction in adult court. (*Id*. at p. 304.) Although an information charging Lara with multiple crimes had been filed in adult court, the trial court suspended proceedings in the adult court and ordered defendant released from custody unless the People commenced a juvenile court proceeding within 48 hours. (*Ibid*.) After the People filed a petition in juvenile court alleging the same crimes and requested a hearing to transfer the matter back to adult court and the hearing was held, the juvenile court denied the People's request. (*Ibid*.)

In *Lara*, however, the Supreme Court endorsed the remedy crafted by Court of Appeal, Fourth District, Division 3 in *People v. Vela* (2017) 11 Cal.App.5th 68, 82, review granted July 12, 2017, S242298 (*Vela I*), which had conditionally reversed a nonfinal judgment and directed that a juvenile court hold a juvenile transfer hearing. (See *Lara*, *supra*, 4 Cal.5th at pp. 310, 313 ["we believe remedies like those provided in *Vela* [*I*] and [*People v.*] *Cervantes* [(2017) 9 Cal.App.5th 569] are readily understandable, and the courts involved can implement them without undue difficulty"].) The Supreme Court in *Lara* recited the appellate court's disposition in *Vela I*: " 'If, after conducting the juvenile transfer hearing, the court determines that it would have transferred Vela to a court of criminal jurisdiction because he is "not a fit and proper subject to be dealt with under the juvenile court law," then Vela's convictions and sentence are to be reinstated. (§ 707.1, subd. (a).) On the other hand, if the juvenile court finds that it would *not* have transferred Vela to a court of criminal jurisdiction, then it shall treat Vela's convictions as juvenile adjudications and impose an appropriate "disposition" within its discretion.' [Citation.]" (*Id.* at p. 310.) After the Supreme Court transferred *Vela I* to the appellate court for reconsideration, the appellate court reached the same disposition. (*People v. Vela* (2018) 21 Cal.App.5th 1099, 1113-1115 (*Vela II*).)

We think it significant that the retroactive application of the juvenile transfer hearing law to persons who had already been convicted in adult court, as sanctioned by the Supreme Court in *Lara*, does not require courts to maintain a fiction that an alleged crime had never been adjudicated. Rather, if after retroactively conducting a transfer hearing the juvenile court finds that it would *not* have transferred the person to criminal adult court, the court must treat the adult convictions as juvenile adjudications. (See *Lara*, *supra*, 4 Cal.5th at pp. 310, 313; *Vela II*, *supra*, 21 Cal.App.5th at pp. 1113-1115.)

Retroactive application of the pretrial diversion law for mental health treatment is plainly distinguishable from retroactive application of Proposition 57 because the

possibility of pretrial diversion under section 1001.36 exists only before "adjudication" under the very terms of the pretrial diversion law.  (See § 1001.36, subd. (c).)  Also, we are unable to say, as was said in *Estrada*, that "the enacting body lacked any discernible reason to limit application of the law with respect to cases pending on direct review." (*Conley*, *supra*, 63 Cal.4th at pp. 658-659.)  We further conclude that the pretense that there had been no "adjudication," which is implicit in a conditional reversal of a defendant's valid nonfinal judgment for the purpose of allowing the trial court to consider the defendant for *pretrial* diversion, is untenable and flies in the face of legislative intent. Such a disposition is inconsistent with the express language of the statute—which permits pretrial diversion only "at any point in the judicial process from the point at which the accused is charged *until adjudication*" (§ 1001.36, subd. (c), italics added)—and with the twin legislative goals of granting early diversion and avoiding the costs of trial and incarceration.  In our view, retroactive application of the pretrial diversion law to a defendant like defendant Khan, who was properly convicted by a jury before the pretrial diversion law was enacted and is now serving his sentence, would produce a result that "the Legislature could not have intended."  (*Conley*, *supra*, at p. 657.)

We agree with the Court of Appeal, Fifth District, which concluded in *People v. Craine* (2019) 35 Cal.App.5th 744 (*Craine*), review granted, Sept. 11, 2019, S256671, that "the text of section 1001.36 and its legislative history contraindicate a retroactive intent with regard to defendants, like Craine, who have already been found guilty of the crimes for which they were charged."  (*Id*. at p. 749.)  That appellate court reasoned that "[t]he primary legislative goal of diverting mentally ill defendants from the criminal justice system through preadjudicative intervention programs cannot be achieved once the defendant has been tried, adjudged guilty, and sentenced" (*id*. at pp. 749-750) and that the "[s]econdary goals of judicial economy and fiscal savings would actually be thwarted by attempting to apply the statute to defendants who have begun serving their sentences." (*Id*. at p. 750.)  The Fifth District found that retroactive application of the pretrial

36

diversion law to such persons would be "antithetical to the Legislature's goals." (*Id*. at p. 759.) It held that "section 1001.36 does not apply retroactively to defendants whose cases have progressed beyond trial, adjudication of guilt, and sentencing." (*Id*. at p. 760.)

We respectfully disagree with Justice Grover, who dissents in this case, and another panel of this court and other courts that have followed *Frahs*. (See e.g., *People v. Hughes* (2019) 39 Cal.App.5th 886, 896; *People v. Burns* (2019) 38 Cal.App.5th 776, 787; *People v. Weaver* (2019) 36 Cal.App.5th 1103, 1120-1122, review granted October 9, 2019, S257049.) In light of the text, structure, and purposes of the pretrial diversion law (§§ 1001.35, 1001.36), we conclude that the Legislature did not intend the law to be applied post-adjudication to defendants who have already been properly tried and found guilty, and are serving their sentences.[7]

## DISPOSITION

The judgment is affirmed.

---

[7] Our conclusion does not settle whether the pretrial diversion law was meant to apply to defendants whose alleged offenses were committed *before* the law's effective date but whose cases are still at the pre-adjudication stage. Neither does it resolve whether the pretrial diversion law was meant to apply to defendants whose alleged offenses were committed before the law's effective date, whose convictions are overturned on appeal, and who may be subjected to a full retrial.

_____

ELIA, J.

I CONCUR:


_____

PREMO, ACTING P. J.




*People v. Khan*
H045524

**Grover, J., Dissenting**

The enactment of Penal Code section 1001.36 provided an ameliorative benefit (potential mental health diversion) to an identifiable class (criminal defendants with recognized mental disorders). Under the rule of *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), we must infer that a new ameliorative benefit applies to all nonfinal judgments "unless the enacting body 'clearly signals its intent to make the amendment prospective, by the inclusion of either an express saving clause or its equivalent.' " (*People v. DeHoyos* (2018) 4 Cal.5th 594, 600.) I respectfully disagree with the majority's conclusion that such an intent appears in the text or legislative history of Penal Code section 1001.36. I would conditionally reverse defendant's convictions consistent with *People v. Frahs* (2018) 27 Cal.App.5th 784 (review granted December 27, 2018, S252220) (*Frahs*) and *People v. Weaver* (2019) 36 Cal.App.5th 1103.

For qualifying criminal defendants, Penal Code section 1001.36 provides for "the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment." (Pen. Code, § 1001.36, subd. (c), defining "pretrial diversion".) The Legislature enacted Penal Code section 1001.36 along with Penal Code section 1001.35, which codified the Legislature's purposes in creating the mental health diversion scheme. The stated purposes include promoting "[i]ncreased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety." (Pen. Code, § 1001.35, subd. (a).) Limiting the reach of Penal Code section 1001.36's benefits to prospective application would be inconsistent with the

1

legislative purpose to increase diversion of mentally disordered individuals like defendant.

The majority quotes with approval *People v. Craine* (2019) 35 Cal.App.5th 744, in which the court reasoned that *Estrada* does not apply to Penal Code section 1001.36 because the "[s]econdary goals of judicial economy and fiscal savings would actually be thwarted by attempting to apply the statute to defendants who have begun serving their sentences." (*Craine*, at p. 750.) The "secondary goals" of judicial economy and fiscal savings derive from statements in legislative committee reports for both the original enactment and later amendment of Penal Code section 1001.36. (E.g., Sen. Rules Com., Office of Sen. Floor Analyses, Rep. on Sen. Bill No. 215 (2017-2018 Reg. Sess.) as amended Aug. 23, 2018.) But the same goals and the same legislative history materials support application of the *Estrada* rule. A Senate Rules Committee report states that "while community based treatment for a mentally ill defendant costs roughly $20,000 per year (and greatly reduces recidivism), jailing that same defendant (with a greater risk of recidivism) costs the community more than $75,000 a year." (Sen. Rules Com., Office of Sen. Floor Analyses, Rep. on Sen. Bill No. 215 (2017-2018 Reg. Sess.) as amended Aug. 23, 2018, p. 2.) Assuming the figures' accuracy for purposes of discussion, diverting all qualified individuals with nonfinal judgments would save tens of thousands of dollars per person per year. Those savings would more than offset the costs of conducting Penal Code section 1001.36 eligibility hearings for a presumably modest number of defendants having both a qualifying mental health diagnosis and a nonfinal judgment.

The majority also finds an intent for prospective application in the structure of the new law, noting that diversion hearings are designed to occur before trial. But the Supreme Court has rejected the same structural argument in the context of The Public Safety and Rehabilitation Act of 2016 (Proposition 57), the voter initiative which

2

eliminated the direct filing of criminal charges against juveniles in adult court in favor of transfer hearings in juvenile court. (*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299.) The *Lara* court applied *Estrada's* presumption of retroactivity to Proposition 57, even though that will return all qualifying nonfinal convictions to juvenile courts for transfer hearings that are similarly designed to occur before trial. If the pretrial nature of that ameliorative change did not foreclose retroactivity, I do not see how an analogous structure could do so here. I agree with the reasoning of *Frahs* and *People v. Burns* (2019) 38 Cal.App.5th 776, 787, that the pretrial timing inherent in both Proposition 57 and Penal Code section 1001.36 simply reflects how those provisions will ordinarily operate and should not be interpreted as a bar to retroactivity.

I see no clear signal of legislative intent to limit the ameliorative change in Penal Code section 1001.36 to prospective application. I would conditionally reverse the judgment and direct the trial court to hold a hearing to determine whether defendant is entitled to receive the benefit of mental health diversion.


_____
GROVER, J.




**H045524 - *The People v. Khan***


3

| Trial Court: | Santa Clara County Superior Court<br>Superior Court No. B1683806 |
|---|---|
| Trial Judge: | Hon. Vincent J. Chiarello |
| Counsel for Plaintiff and Respondent:<br>THE PEOPLE | Xavier Becerra<br>Attorney General<br><br>Gerald A. Engler<br>Chief Assistant Attorney General<br><br>Jeffrey M. Laurence<br>Senior Assistant Attorney General<br><br>René A. Chacón<br>Supervising Deputy Attorney General<br><br>Bruce Ortega<br>Deputy Attorney General |
| Counsel for Defendant and Appellant:<br>MUHAMMAD KHAN | Jared G. Coleman<br>Sixth District Appellate Program |

*People v. Khan*
H045524